**UNITED STATE DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AMANDA MYERS, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15 C 07418 |
| v. | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| TINA HAROLD, an individual, and | ) | |
| THE DANCE SHOP, INC., an Illinois | ) | |
| Corporation, | ) | |
| | ) | |
| Defendants. | | |

**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(B) RESPONSE TO DEFENDANTS'
STATEMENT OF PURPORTEDLY UNDISPUTED MATERIAL FACTS (DKT. # 53)
AND LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS
REQUIRING DENIAL OF SUMMARY JUDGMENT**

**I.     PLAINTIFFS' L.R. 56.1(b)(3)(B) RESPONSE TO DEFENDANTS' FACT
STATEMENT**

Pursuant to Local Rule 56.1(b)(3)(B), Plaintiff Amanda Myers ("Plaintiff" or "Myers")

responds to Defendant's Local Rule 56.1(a) statement of purportedly undisputed material facts as

follows:

**BACKGROUND**

1.     Defendant Tina Harold ("Harold") is the president and sole owner of The Dance
Shop, Inc., ("TDS"), a dance studio located in Chicago Ridge, IL (Deposition of Tina Harold
("Harold Dep. Tr."), attached hereto as Exhibit A, at 4:21-22, 5:6-7; Declaration of Tina Harold
("Harold Dec.") attached hereto as Exhibit B, at ¶3).

**RESPONSE:     Admitted.**

2.     Plaintiff Amanda Myers ("Plaintiff" or "Myers") alleges that she is a citizen of the
United States, and resides in the City of Chicago, County of Cook, in the State of Illinois (Plaintiff's
Complaint attached hereto as Exhibit C, at ¶ 3).

**RESPONSE:     Admitted.**

3. On August 24, 2015, Plaintiff filed a lawsuit against Harold and TDS alleging infringement of copyright claims under the Copyright Act of 1976, and a common law unjust enrichment claim. Plaintiff alleged that dances she choreographed to the songs *Baby I'm a Star*, *Turn Down for What*, *Desperate Housewives*, *Music Box Dancer*, and *Guts and Glory* were infringed upon by Defendant on the following occasions, collectively ("Infringing Performances"):

      (a)     Defendants' Spring 2015 recital

      (b)     In June 2015 at Alsip's Got Talent

      (c)     In July 2015 at Oaklawn's Got Talent

      (d)     In July 2015 at Ridgefest

(See Plaintiff's Complaint ¶¶15,24,30,31).

**RESPONSE:** **Admitted.**


4. The first time Plaintiff ever asserted any claim that any dance she ever choreographed while working at TDS was protected under the U.S. Copyright Act was after she resigned from TDS on February 25, 2015 (Harold Dec. ¶22; Deposition of Amanda Meyers ("Myers Dep. Tr."), attached hereto as Exhibit D, at ¶83:19 – 84:1).

**RESPONSE:** **Denied. The cited passage of the Harold declaration only speaks to discussions of which Harold has knowledge. Moreover, Plaintiff states that the protections provided to original choreographic works are part of the U.S. Copyright Act and operate as a matter of law. Assertion of those rights is irrelevant to the existence of Plaintiff's ownership of her copyrighted materials. Moreover, the Myers deposition testimony cited by Defendants says nothing about "the first time Plaintiff ever asserted any claim" about anything to anyone.**


5. The first time Plaintiff ever provided Defendants with any type of documentation supporting her claims that any dance she ever choreographed while working at TDS was protected under the U.S. Copyright Act was after she filed her lawsuit in federal court (Harold Dec. ¶23).

**RESPONSE**: **Denied. Plaintiff provided written notification of her refusal to license Defendants' use of her original copyrighted works and her demand that Defendants not use her original copyrighted works at least as early as February 25, 2015. (Deposition of Amanda Myers, attached hereto as Exhibit 1 ("Ex. 1, Myers Dep. Tr.") at 12:3-17; 82:5-8). Copyright protection applies as a matter of law and Plaintiff's assertion of those rights is irrelevant to any matter at issue in this case.**

## PLAINTIFF'S EMPLOYMENT AT THE DANCE SHOP

6.       Plaintiff was hired by Harold in September, 2011 to choreograph and teach dances to TDS students, review technique and prepare those students for performance opportunities throughout the year, including at least one TDS recital (Myers Dep. Tr. 70:16-71:17; 74:13-75:4; Harold Dep. Tr. 46:20-47:3; Harold Dec. ¶¶4-6; Declaration of Ryan Brandt ("Brandt Dec."), attached hereto as Exhibit E, at ¶¶5,8,13-15).

**RESPONSE**: **Denied, in part. It is admitted that Plaintiff was hired to teach dance classes at The Dance Shop. (Ex. 1, Myers Dep. Tr. at 70:16-71:2). It is further admitted that Myers began working as an independent contractor associated with The Dance Shop beginning in September 2011. (Ex. 1, Myers Dep. Tr. at 59:9-22; *see also* Ex. 1 at 69:5-10; Deposition of Tina Harold, attached hereto as Exhibit 2 ("Ex. 2, Harold Dep. Tr.") at 21:5-22:22, 69-70). Plaintiff denies that there was any condition relating to her working relationship with The Dance Shop that gave The Dance Shop ownership of her original choreographic works. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 80, *citing* Declaration of Amanda Myers dated December 5, 2016 attached hereto as Exhibit 4 ("Ex. 4, Myers Decl.") at ¶ 5). Moreover, providing choreography for recitals was never mentioned in any way at the time or Plaintiff's hiring. (*See* Ex. 2, Harold Dep. Tr. at 72:7-13; *id.* at 127:16-128:11 (Defendants never asserted ownership of any of Myers choreography); *see also***

**Harold Deposition Ex. 4 attached hereto as Ex. 3, ("Ex. 3, Craigslist Ad") (Craigslist ad for job states nothing about choreography)**

7.      A "dance season" or "dance year" at TDS corresponds with the traditional school year, beginning in the Fall of one year and culminating in the Spring of the next (Myers Dep. Tr. 46:5-8; Harold Dec. ¶29).

**RESPONSE:   Admitted.**

8.      Each TDS dance season culminates with a dance recital, the "Spring Recital", wherein TDS students perform the dances they spent the previous nine months learning for their families, friends, and other members of the community (Myers Dep. Tr. 41:21-42:1).

**RESPONSE:   Denied, in part.   Plaintiff denies that TDS students "spent nine months learning" the dances for any recitals.   (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 84 *citing* Ex. 4, Myers Decl. at ¶ 9).   Instead, dances for the recital would be introduced at some point during the year, but not at the very beginning.   Plaintiff testified that she would present choreography to teach students in the winter months, November or December at the earliest.   (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 84, *citing* Ex. 4, Myers Decl. at ¶ 9). Moreover, the record establishes that some teachers did not begin teaching dances for the recital until February of a given year.   TDS was new at the time Plaintiff was hired and no prior recitals had occurred at that time.   (Ex. 2, Harold Dep. Tr. at 7:17-19, 20:1-19; Ex. 1, Myers Dep. Tr. at 35:22-36:5, 43:9-18, 70:16-71:2 (The Dance Shop opened in September 2011 and Plaintiff began teaching there at that time.)).   Plaintiff admits that, in the years she worked at TDS, recitals occurred in the springtime.**

9.      Since opening in 2011, Harold has verbally expressed her expectations regarding the dance instructors primary job duties (Harold Dec. ¶6; *See also* Brandt Dec. ¶¶5,8,13-15).

4

**RESPONSE:** **Denied. No written or verbal agreement exists between Plaintiff and Defendants (Ex. 2, Harold Dep. Tr. at 33:2-34:22, 38:13-40:13, 100:13-22). Moreover, Defendants admit that they never discussed ownership of choreography created by dance instructors at The Dance Shop and that at no time did Plaintiff have a work-for-hire agreement with Defendants. (Ex. 2, Harold Dep. Tr. at 38-40, 42). Defendants' citation to the Brandt declaration is irrelevant. Brandt lacks first-hand knowledge of any occurrences at The Dance Shop before she was hired in February 2015. So, Ms. Brandt lacks foundation to make any statements about anything that occurred while Plaintiff was teaching at The Dance Shop. Moreover, the cited portion of the Harold Declaration is contrary to testimony given at deposition as cited above. At a minimum, Harold's testimony that contradicts her statement in her affidavit creates a fact issue on the matters asserted in ¶ 9.**

10. In September 2011, Harold posted an ad for a dance instructor on Craigslist.com, and Plaintiff responded to that ad (Myers Dep. Tr. 36:3-5, 37:5-11; Harold Dec. ¶7; *see also* Defendants' 2011 Craigslist Ad attached hereto as Exhibit F).

**RESPONSE:** **Admitted.**

11. Based on Plaintiff's experience in choreographing and teaching dance-as represented in her resume, Harold interviewed Plaintiff (Harold Dec. ¶8). During the interview, Plaintiff discussed her work history, which included working at a dance school under a verbal agreement that whatever dances created and taught would be used for competition and recitals (Myers Dep. Tr. 28:21-29:11; 41:5-9).

**RESPONSE:** **Plaintiff denies that, during her interview with Defendant Harold, that there was any discussion regarding whether her "work history . . . included working at a dance school under a verbal agreement that whatever dances created and taught would be used for competition and recitals." (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 80, *citing* Ex. 4, Myers Decl. at ¶ 5). Plaintiff admits that she testified about her work history and that**

she was interviewed by Defendant Harold, but neither Defendant Harold nor Plaintiff has suggested that this matter was discussed at the interview.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 79, *citing* Ex. 4, Myers Decl. at ¶ 4).  The second sentence of paragraph 11 is nothing more than misleading paraphrasing and should be disregarded.

12.    During Plaintiff's interview, Harold explained that she needed dance instructors to choreograph and teach dances to students so that the students would be able to perform those dances and the Spring Recitals, and at other performance opportunities throughout the dance year (Myers Dep. Tr. 41:5-42:9; Harold Dep. Tr. 99:18-23; 100:6-12; Harold Dec. ¶9).

**RESPONSE:**    Plaintiff denies that Harold explained at the initial interview that she needed dance instructors to choreograph anything.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 81, *citing* Ex. 4, Myers Decl. at ¶ 6).  First, the cited testimony of Plaintiff simply states that she recalls that, at the interview, they discussed, "[j]ust what my experience was, what I want to teach, could teach, and just helping her with ideas on building the studio and getting it running."  Plaintiff testified that the discussion was very vague and just about teaching classes.  She further testified that she did not recall talking about an end-of-year recital.  She also testified that she recalled talking about the possibility of putting together a competition team.  Plaintiff disputes that Harold brought up choreography at all during that meeting.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 81, *citing* Ex. 4, Myers Decl. at ¶ 6).  In fact, choreography was never discussed during that meeting.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 81, *citing* Ex. 4, Myers Decl. at ¶ 6).  Defendant Harold was always vague in discussing expectations for instructors regarding shows and preparation.   (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 82, *citing* Ex. 4, Myers Decl. at ¶ 7).  Defendant Harold is not an experienced dancer and did not ever identify any interest in obtaining rights to choreography created by Plaintiff for any purpose.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 83, *citing* Ex. 4, Myers Decl. at ¶ 8).

6

13.    Plaintiff accepted the position offered by Harold, to create choreography and teach it to TDS students, and to prepare them for performances at a rate of $20 per hour (Myers Dep. Tr. 41:12-16, 43:2-3, 70:16-71:17; 74:13-75:4; Harold Dec. ¶9).

**RESPONSE:    Denied.  Plaintiff admits that she accepted a position to teach dance at The Dance Shop at a rate of $20 per hour.  (Ex. 1, Myers Dep. Tr. at 40:5-16, 70:16-71:17).  Plaintiff denies the remainder of paragraph 13.  Specifically, the creation of choreography was neither part of the position offered nor discussed as part of the compensation for hourly work.  (*Id.*)  Moreover, the $20 per hour paid to Plaintiff by Defendants was, in 2011, directly tied to the hours spent teaching classes.  (*Id.*)  In fact, Harold has even admitted she never had ownership over Plaintiff's choreography.  (Ex. 2, Harold Dep. Tr. at 127:16-128:8).**

14.    Plaintiff's job duties and responsibilities as a dance instructor with Defendants remained constant throughout her entire tenure with TDS (Myers Dep. Tr. 44:1-45:22; Harold Dec. ¶¶5,6).  Those duties included choreographing and teaching dances to TDS students, reviewing technique and preparing those students for performance opportunities throughout the year, including at least one TDS recital (Myers Dep. Tr. 70:16-71:17; 74:13-75:4; Harold Dec. ¶¶ 4, 9; Brandt Dec. ¶¶5-8, 14-15).

**RESPONSE:    Denied, in part.  Plaintiff was an independent contractor and did not have "job duties" or "responsibilities" aside from teaching classes at the hourly rate of $20 or $30 per hour.  (Ex. 1, Myers Dep. Tr. at 70:16-71:17).  Plaintiff at times performed office administrative work as a contractor and was paid at an hourly rate for that work. (Ex. 1, Myers Dep. Tr. at 122:1-24:21).  Plaintiff only admits that she acted as a contracted dance instructor and that she taught students dance techniques.**

15.    While working for TDS, Plaintiff was paid in full for all hours she reported spending choreographing and teaching dances to TDS students (Myers Dep. Tr. 54:2-6).  For each season Plaintiff taught at TDS through the year-end recital, Plaintiff would receive a cash bonus from Defendants (Myers Dep. Tr. 54:1-55:22).

7

**RESPONSE: Denied. Plaintiff was never compensated for time spent choreographing, but only for hours teaching dance classes and, at times, doing administrative work in the office. (Ex. 1, Myers Dep. Tr. at 70:16-71:17; 122:1-24:21). Plaintiff also denies that any cash bonus received from Defendants was ever part of any negotiated compensation. Nothing in the record supports such an assertion.**

## PLAINTIFF'S WORK WITH FINAL CUT DANCE COMPANY ("FCDC")

16.     When Plaintiff began working at TDS, she and Harold discussed TDS students entering into competitive dance competitions after TDS's first season in business (Myers Dep. Tr. 42:13-43:8). FCDC, the competition team, began its first season in 2012 (Myers Dep. T. 73:16-18).

**RESPONSE:     Admitted.**

17.     For the 2014-2015 dance season, Plaintiff only worked with TDS students who were also interested in dancing competitively with TDS's FCDC because Plaintiff was focusing on school and other projects (Myers Dep. Tr. 73:4-11, 74:3-11).

**RESPONSE: Denied, in part. Plaintiff denies that she "worked with TDS students who were also interested in dancing competitively" during the 2014-15 season. In fact, the cited testimony does not even support that proposition. Plaintiff admits that she only worked with the FCDC participants during the 2014-15 school-year.**

18.     Beginning with the 2012-2013 dance season, Plaintiff, Defendants, TDS students (and their parents) who wished to dance competitively entered into a "Company Agreement" that "tells everything about the whole [dance] season and what to expect." (Myers Dep. Tr. 76:13-18; Harold Dec. ¶12-17; See also Declaration of Kathy Slusinksi ("Slusinksi Dec."), attached hereto as Exhibit G at ¶¶1-5, 8, 11-20, and attachment A and B thereto; Declaration of Nicole Connell ("Connell Dec."), attached hereto as Exhibit H at ¶¶10-12, and attachment A thereto; Brandt Dec. ¶¶12-13).

**RESPONSE: Denied, in part. Defendants failed to present any copy of the "Company Agreements" in any manner before the close of fact discovery. Instead, without**

express leave of court, they simply included those documents with their summary judgment filings, severly prejudicing Plaintiff. Thus, attachments A and B to Exhibit G (Dkt. #53-1 at 68-77) and attachment A to Exhibit H (Dkt. #53-1 at 86-92) should be disregarded. Even if these late-produced documents are not disregarded, by the document's own terms, Plaintiff was never a party to any of the "Company Agreements." (*See* Dkt. #53-1 at 68-77 and 86-92; Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶¶ 94, 99, *citing* Ex. 4, Myers Decl. at ¶¶ 19, 23 ) The "Agreements" are simply pledges or a code of conduct for participants in the FCDC. While Plaintiff admits that students signed the "Company Agreement." (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 87, *citing* Ex. 4, Myers Decl. at ¶ 12). That document does not imply any transfer or rights in Plaintiff's original choreographic works. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 97, *citing* Ex. 4, Myers Decl. at ¶ 22).

19. If a student wanted to perform a solo, or duet in the annual spring recital, competitions, and other performances throughout the dance year, the parent would have to enroll the student in a solo, or duet class at the beginning of the dance year. These classes were separate from group classes for which the parents were charged tuition for each dance season (Harold Dec. ¶ 25-26; Connell Dec. ¶¶13-14, 26, 29, 32).

**RESPONSE: Denied. Pursuant to Local Rule 56.1(a)(3) Defendants were required to submit a statement of *material* facts. Paragraph 19 should be disregarded as immaterial. To the extent students participated in additional classes, those classes were paid for and Defendants received compensation for those classes. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 85, *citing* Ex. 4, Myers Decl. at ¶ 10). None of those payments were provided to Plaintiff in any manner and Plaintiff had no role in that transaction. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶¶ 85, 86 *citing* Ex. 4, Myers Decl. at ¶¶ 10, 11). Those transactions were purely between students and Defendants. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 87, *citing* Ex. 4, Myers Decl. at 12).**

20.     Parents were charged separate additional fees for solo classes and duet classes, beyond the dance year tuition fee, in order to pay the instructor to choreograph and teach solos and duets for specific students according to the students' skill set and abilities (Harold Dec. 26-27; Connell Dec. ¶¶13-14, 26, 29, 32).

**RESPONSE:     Denied.     Pursuant to Local Rule 56.1(a)(3) Defendants were required to submit a statement of *material* facts.   Paragraph 20 should be disregarded as immaterial.   To the extent students participated in additional classes, those classes were paid for and Defendants received compensation for those classes.   (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 85, *citing* Ex. 4, Myers Decl. at ¶ 10).   None of those payments were provided to Plaintiff in any manner and Plaintiff had no role in that transaction.   (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶¶ 85, 86, *citing* Ex. 4, Myers Decl. at ¶¶ 10, 11).   Those transactions were purely between students and Defendants.   (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 87, *citing* Ex. 4, Myers Decl. at ¶ 12).**

21.     Beginning in 2012, and continuing through the 2014-2015 dance season, no student was permitted to participate in FCDC unless they/their parents executed the "Company Agreement" (Harold Dec. ¶21).

**RESPONSE:     Admitted.**

22.     These agreements were drafted and presented by the Plaintiff, who met with the parents to outline the terms and conditions of membership in FCDC for each dance year (Meyers Dep. Tr. 76:5-8; Harold Dec. ¶¶12-13, 16-17; Slusinksi Dec. ¶5-9, 15-18).

**RESPONSE:     Admitted.**

23.     Parents received the 2014-2015 Agreement via email, and again at a TDS parent meeting headed by Plaintiff, sometime in August of 2014 (Slusinksi Dec. ¶15; Connell Dec. ¶16).

**RESPONSE:     Admitted.**

24.     At the August 2014 TDS parent meeting, Plaintiff reviewed and explained the terms and conditions of the FCDC agreement, and stated that students could perform at

10

any function, so long as they did not violate the contract, which prohibits the students from dancing for or under another dance studio and/or competition team. (Slusinksi Dec. ¶¶16-17; Connell Dec. ¶¶16-18). Slusinksi, along with the other parents, then tendered a signed copy of that agreement to the Plaintiff (Slusinksi Dec. ¶9, 14-16; Connel Dec. ¶15).

**RESPONSE:** **Admitted.**

25. Sometime after February 2015, the executed Company Agreements were removed from the area where Defendants kept them (a file that was accessible to both parents and instructors). After diligent inquiry, Defendants have not been able to locate the executed company agreements (Harold Dec. ¶ 18-19).

**RESPONSE:** **Denied. Pursuant to Local Rule 56.1(a)(3) Defendants were required to submit a statement of *material* facts. Paragraph 20 should be disregarded as immaterial. To the extent students participated in additional classes, those classes were paid for and Defendants received compensation for those classes. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 85, *citing* Ex. 4, Myers Decl. at ¶ 10). None of those payments were provided to Plaintiff in any manner and Plaintiff had no role in that transaction. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶¶ 85, 86, *citing* Ex. 4, Myers Decl. at ¶¶ 10, 11). Those transactions were purely between students and Defendants. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 87, *citing* Ex. 4, Myers Decl. at ¶ 12). Moreover, Defendants' failure to maintain their files does not excuse their delay in producing the "Company Agreement."**

26. The 2012-2013 Agreement provided in part:

    a. TDS/FCDC students were permitted to perform the choreographed dance routines they learn throughout the dance season at TDS recitals and school functions (Harold Dec. ¶ 12-15; Slusinksi Dec. ¶¶ 18-20 and Exhibit B attached thereto).

    b. In exchange for the right of TDS/FCDC students to compete, to perform at the spring recital, and to perform at other "opportunities," students needed to take a minimum number of classes at TDS, attend a specified number of practice sessions, and pay registration, tuition, costume, competition, and other incidental fees including late fees, the cost of a warm-up suit, and the cost of action and headshots (Slusinksi Dec. at Exhibit B; Harold Dec. at Exhibit A).

      c.    Students were prohibited from performing under any title independent of TDS or FCDC, or competing "for any other dance studio or company." (Slusinksi Dec. ¶¶ 18-20 and Exhibit B attached thereto.

**RESPONSE:**    **Denied.  The 2012-2013 Agreement language does not state what is claimed in this paragraph.  (Dkt. #53-1 at Ex. G (Ex. B thereto at 75-77).  First, the agreement says nothing about permitting students to perform choreographed dance routines.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 92, *citing* Ex. 4, Myers Decl. at ¶ 18; Dkt. #53-1 at Ex. G (Ex. B thereto at 75-77)  In fact, the word "choreography" does not appear in the document at all.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 93, *citing* Ex. 4, Myers Decl. at ¶ 18; Dkt. #53-1 at Ex. G (Ex. B thereto at 75-77).  Second, all of the obligations to take additional classes were agreements to take classes from The Dance Shop and not Plaintiff. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 87, *citing* Ex. 4, Myers Decl. at ¶12; Dkt. #53-1 at Ex. G (Ex. B thereto at 75-77).   None of the benefits of these agreements were conferred to Plaintiff and all were conferred to Defendants.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶¶ 85, 86, *citing* Ex. 4, Myers Decl. at ¶¶10, 11; Dkt. #53-1 at Ex. G (Ex. B thereto at 75-77). Finally, the Agreements were executed only by dancers and parents and entered into between them and The Dance Shop.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 87, *citing* Ex. 4, Myers Decl. at ¶ 12; Dkt. #53-1 at Ex. G (Ex. B thereto at 75-77).  To the extent Plaintiff was involved in this process, it was merely in here role as a contracted instructor at The Dance Shop and not in her personal capacity.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 88, *citing* Ex. 4, Myers Decl. at ¶ 13; Dkt. #53-1 at Ex. G (Ex. B thereto at 75-77).**

    27.    The 2014-2015 Agreement provided in part:

      a.    Amanda Myers committed to teaching dance to students for the 2014-2015 dance year (p.1);

      b.    Additional classes would be required, and extra fees would apply (p.2);

c.    Dancers were required to attend all classes, and were allowed up to 3 absences per semester, or could be subject to removal (p.3);

d.    Absences/tardiness required a phone call or text to Amanda Myers (p.3);

e.    Any issues or concerns MUST go through Amanda Myers only (p.3);

f.    Jazz and Lyrical Dancers must attend weekly ballet/barre classes-all team members will participate in a team production dance at every competition (p.3);

g.    FCDC Dancers cannot compete with any other competitive dance studios or take technique classes or private lessons anywhere else (p. 3);

h.    Cancellation fees of 50% for the instructors time is charged for cancellation of special dance/private lessons (p.3);

i.    Costs are outlined for annual member registration fees, and entry fees (p.4);

j.    FCDC will attend 4 competitions as well as various performances throughout the dance year (p.5);

k.    Becoming a FCDC member obligates dancers to these performances and competitions (p.5); and

l.    By signing the contract, dancers agree to everything listed in the agreement (p.6).  (Slusinksi Dec. ¶11 and Exhibit A attached thereto; Connell Dec. ¶12 and Exhibit A attached thereto).

**RESPONSE:    Denied.  The 2014-2015 Agreement language does not state what is claimed in this paragraph.  Plaintiff is not a party to the 2014-15 Agreement.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 99, *citing* Ex. 4, Myers Decl. at ¶23).  Moreover, the language of the agreement is the best evidence of the terms of that document.  (Dkt. #53-1 at Ex. G (Ex. A thereto at 68-74)).    Defendants' characterizations are irrelevant and should be disregarded. First, the agreement says nothing about permitting students to perform choreographed dance routines.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 97, *citing* Ex. 4, Myers Decl. at ¶ 22; Dkt. #53-1 at Ex. G (Ex. A thereto at 68-74)).  In fact, the word "choreography" does not appear in the document at all.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 98, *citing* Ex. 4, Myers Decl. at ¶22; Dkt. #53-1 at Ex. G (Ex. A thereto at 68-74)).**

13

**Second, all of the obligations to take additional classes were agreements to take classes from The Dance Shop and not from Plaintiff. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 99, *citing* Ex. 4, Myers Decl. at ¶ 23; Dkt. #53-1 at Ex. G (Ex. A thereto at 68-74)). None of the benefits of these agreements were conferred to Plaintiff and all were conferred to Defendants. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 100, *citing* Ex. 4, Myers Decl. at ¶ 23; Dkt. #53-1 at Ex. G (Ex. A thereto at 68-74)). Finally, the Agreements were executed only by dancers and parents and entered into between them and The Dance Shop. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 101, *citing* Ex. 4, Myers Decl. at ¶ 23; Dkt. #53-1 at Ex. G (Ex. A thereto at 68-74)). To the extent Plaintiff was involved in this process, it was merely in her role as a contracted instructor at The Dance Shop and not in her personal capacity. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 88, *citing* Ex. 4, Myers Decl. at ¶ 13; Dkt. #53-1 at Ex. G (Ex. A thereto at 68-74)).**

28. Plaintiff drafted the Agreement to ensure that all four parties (Plaintiff, Defendants, TDS students, and their parents) "had everything in place in order, [that there would be] no drama about what the rules are, [and that all parties understood] who pays what." (Myers Dep. Tr. 76:9-11; 76:13-18, Harold Dec. ¶¶12-13).

**RESPONSE: Plaintiff denies that she was a party to the Agreement or that the Agreement in any way conferred any right to Defendants to use her original choreographic works. (Dkt. #53-1 at Ex. G (Ex. A thereto at 68-74; Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 102, *citing* Ex. 4, Myers Decl. at ¶ 24).**

29. Prior to the September 2014 parent meeting at TDS, Plaintiff emailed the 2014-2015 Agreement to the parents (Slusinksi Dec. ¶15; Connell Dec. ¶16). At the meeting, Plaintiff again provided copies of the 2014-2015 Agreement, and reviewed the terms and conditions with the parents (Slusinksi Dec. ¶15; Connell Dec. ¶17). The parents signed the Agreements, and returned them to Plaintiff (Slusinksi Dec. ¶¶9-10,14; Connell Dec. ¶15).

**RESPONSE: Admitted.**

30.    In the 2014-2015 Agreement, Plaintiff made a personal commitment to teach the FCDC students for the 2014-2015 dance year (Slusinksi Dec. ¶11(a); Connell Dec. ¶12(a); Myers Dep. Tr. 76:13-18).

**RESPONSE:   Denied.   Plaintiff is not a party to the 2014-15 Agreement. Moreover, the language of the agreement is the best evidence of the terms of that document.  (Dkt. #53-1 at Ex. G (Ex. A thereto at 68-74; Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 99, *citing* Ex. 4, Myers Decl. at ¶ 23).  Defendants' characterizations are irrelevant and should be disregarded.**

31.    If TDS/FCDC students failed to meet the attendance requirements outlined in 2014-2015 Agreement, they would be prevented only from competing; they would still be permitted to participate in the Spring Recital and other performances (Myers Dep. Tr. 76:1-4).

**RESPONSE:   Denied.  Plaintiff is not a party to the 2014-15 Agreement.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 99, *citing* Ex. 4, Myers Decl. at ¶ 23).  Moreover, the language of the agreement is the best evidence of the terms of that document.  Defendants' characterizations are irrelevant and should be disregarded.**

32.    Under the Company Agreements, Defendants had no right to limit TDS students' ability to perform in events where they were not competing for or taking classes at any other studios (Harold Dec. ¶24; Slusinksi Dec. ¶11(g); Connell Dec. ¶12(g)).

**RESPONSE:   Denied.  The Company Agreement did not in any way contravene existing law and Defendants always remained obligated to refrain from contributing to copyright infringement.  To the extent Defendants were aware that a student intended to perform a dance that would infringe the copyrights of another, Defendants violated the law in helping prepare students to engage in such infringing performances.  Moreover, Plaintiff is not a party to the 2014-15 Agreement.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 99, *citing***

Ex. 4, Myers Decl. at ¶ 23).  **The language of the agreement is the best evidence of the terms of that document.  Defendants' characterizations are irrelevant and should be disregarded.**

33.     For the 2014-2015 dance year, in exchange for providing all facilities necessary to effectuate the purpose of the Agreement, payments of monies owed under the Agreement were made directly to Defendants (Harold Dec. ¶¶20,30).  Defendants then paid Plaintiff $30 per hour for choreographing dance routines, and teaching those dance routines to her TDS/FCDC students to perform in the upcoming Spring Recital and competitions, and $10 per hour for services not including dance choreography or instruction. (Myers Dep. Tr. 46:22-47:22, 54:2-6, 121:4-5; Harold Dec. ¶28).

**RESPONSE:     Denied.  As Plaintiff testified at the cited passages, Defendants did not pay Plaintiff for choreographing dance routines.  (*See* Ex. 1, Myers Dep. Tr. at 46:22-47:22, 54:2-6, 121:4-5; *see also* (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 81, *citing* Ex. 4, Myers Decl. at ¶ 6).  Instead, Plaintiff was paid either $20 or $30 per hour for her time worked in the dance studio teaching classes and $10 per hour for administrative work such as preparing printed programs for recitals.  (*Id.*)  The cited paragraph of the Harold Declaration says nothing about choreography.  Moreover, at deposition Harold testified that she was not sure she had ever paid for the right to use choreography.  (Ex. 2, Harold Dep. Tr. at 14:15-17).**

## PLAINTIFF'S RESIGNATION FROM THE DANCE SHOP

34.     On February 25, 2015, with no prior notice that February 25th would be her last day, Plaintiff sent Harold a text message resigning from her position as a dance instructor at TDS (Myers Dep. Tr. 80:13-18; Harold Dec. ¶10).

**RESPONSE:     Denied, in part.  Plaintiff had discussed with Harold for some time her concerns about her ability to continue on with The Dance Shop.  (Ex. 1, Myers Dep. Tr. at 75:10-79:15).**

35. On February 25, 2015, Plaintiff was scheduled to teach a class of TDS students, but did not teach her scheduled class because she decided to resign from TDS (Myers Dep. Tr. 80:21-81:1).

**RESPONSE:** **Admitted.**

36. Plaintiff testified that she stopped working at The Dance Shop because she was upset that her "contract" (the Company Agreement) was not being followed, in that Harold did not support Plaintiff's attempt at removing one TDS student from the competition team who had more absences than was permitted in the contract (Myers Dep. Tr. 75:8-77:6).

**RESPONSE:** **Denied. Plaintiff testified that she was concerned about The Dance Shop and Harold's unwillingness to demand participation in preparation from FCDC participants. (Ex. 1, Myers Dep. Tr. at 75:10-79:15). She did not testify at all about any "contract" she had _with_ The Dance Shop. (_Id._) Plaintiff is not a party to the "Company Agreement." Moreover, the language of the agreement is the best evidence of the terms of that document. (Dkt. #53-1 at Ex. G (Ex. A thereto at 68-74). Defendants' characterizations are irrelevant and should be disregarded.**

37. Plaintiff further testified that, had the student been removed from the competition team, the contract still permitted that student to perform her dances at the Spring Recital (Myers Dep. Tr. 76:1-4).

**RESPONSE:** **Denied. Plaintiff testified only that a student could participate in a recital even after being removed from Final Cut Dance Company. (Ex. 1, Myers Dep. Tr. at 75:20-76:4). Plaintiff's testimony says nothing about "her dances." (_Id._)**

38. After February 25, 2015, Plaintiff performed no more work for TDS (Harold Dec. ¶11).

**RESPONSE:** **Plaintiff admits only that she no longer acted as a contractor for The Dance Shop and did not teach additional classes or perform additional administrative work after February 25, 2015.**

39.     After Plaintiff resigned, substitute TDS Instructor Ryan Brandt began working as a regular instructor (Brandt Dec. ¶¶ 10-11). At a rate of $20 per hour, Brandt was required to create dances to teach to TDS students, as well as practice and review technique, to prepare students to perform at the seasons end recital (Brandt Dec. ¶¶5-8).

**RESPONSE:** **Pursuant to Local Rule 56.1(a)(3) Defendants were required to a statement of *material* facts. Paragraph 39 should be disregarded as immaterial. Furthermore, Brandt compensation and work arrangement with The Dance Shop is completely irrelevant to any question relating to whether or not Defendants' infringed on Plaintiff's copyrighted materials.**

40.     After Plaintiff left TDS, FCDC was unable to compete in any performances during the 2014-2015 dance season (Brandt Dec. ¶9).

**RESPONSE:** **Denied. Students from Final Cut Dance Company performed and competed publicly numerous times during 2015. (Def's Local Rule 56.1 Stmt at ¶¶ 50-76 (Final Cut Dance Company students participated in Alsip's Got Talent, Oak Lawn's Got Talent and Ridgefest talent shows). In fact, Defendants include below statements of fact establishing that one of the FCDC participants, won the Alsip's Got Talent competition and was awarded a prize. (*See below* at para. 56).**

41.     Brandt began directing FCDC for the 2015-2016 dance season, making $23 per hour for each hour spent in studio choreographing dances and teaching those dances as well as techniques to students of TDS and participants in FCDC (Brandt Dec. ¶¶10-11).

18

**RESPONSE**: **Denied. Pursuant to Local Rule 56.1(a)(3) Defendants were required to a statement of *material* facts. Paragraph 41 should be disregarded as immaterial. Furthermore, Brandt's compensation and work arrangement with The Dance Shop is completely irrelevant to any question relating to whether or not Defendants' infringed on Plaintiff's copyrighted materials. Moreover, Brandt began working at The Dance Shop *after* Plaintiff stopped working there. Thus, his knowledge and understanding is irrelevant to any issue relating to Plaintiff's claims.**

42.     As part of the Company Agreement, in exchange for Brandt's time spent choreographing and teaching dances to students, and ensuring those students' ability to perform at competitions and other events throughout the year, FCDC students and parents agree to abide by the terms and conditions of the Company Agreement regarding membership in FCDC (Brandt Dec. ¶¶4-8, 10-13).

**RESPONSE**: **Denied. Pursuant to Local Rule 56.1(a)(3) Defendants were required to a statement of *material* facts. Paragraph 42 should be disregarded as immaterial. Furthermore, Brandt compensation and work arrangement with The Dance Shop is completely irrelevant to any question relating to whether or not Defendants' infringed on Plaintiff's copyrighted materials. Moreover, Brandt began working at The Dance Shop *after* Plaintiff stopped working there. Thus, his knowledge and understanding is irrelevant to any issue relating to Plaintiff's claims. Additionally, to the extent Defendants seek to interpret the meaning of the Company Agreement, that agreement is the best evidence and Brandt's declaration about his understanding is irrelevant to the meaning and interpretation of that agreement for purposes of summary judgment.**

43.     According to Brandt, dance instructors at TDS expect their choreography to be performed by their students at the year-end recital and at other performance opportunities throughout the year; those who teach to FCDC participants also expect their choreography to be used competitively; and agree that they are being paid for the dances they create, and that their

19

students have the right to perform those dances anywhere they'd like so long as they are not doing so for another studio or competition team (Brandt Dec. ¶¶ 14-15).

**RESPONSE:** **Denied. Pursuant to Local Rule 56.1(a)(3) Defendants were required to a statement of *material* facts. Paragraph 43 should be disregarded as immaterial. Furthermore, Brandt compensation and work arrangement with The Dance Shop is completely irrelevant to any question relating to whether or not Defendants' infringed on Plaintiff's copyrighted materials. Moreover, Brandt began working at The Dance Shop *after* Plaintiff stopped working there. Thus, his knowledge and understanding is irrelevant to any issue relating to Plaintiff's claims.**

## PLAINTIFF'S ALLEGED CHOREOGRAPHIC WORKS

44.     Upon resigning from TDS, Plaintiff sent Harold at least two text messages requesting that TDS "drop" the choreography Plaintiff had created for, and taught to her students during the preceding six months, and contacted the parents of Defendant's students telling them they were not to "compete" with her choreography. (Myers Dep. Tr. 82:5-8; Slusinksi Dec. ¶21; Connell Dep. ¶19).

**RESPONSE:** **Plaintiff Admits that she sent several text messages to Defendants advising them to stop using her choreography. Plaintiff denies that her students had been working on the same choreography for six months before February 2015. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 84, *citing* Ex. 4, Myers Decl. at ¶9). Plaintiff further admits that she communicated with parents of students and told them they could not use her choreography with The Dance Shop of Final Cut Dance Company. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 103, *citing* Ex. 4, Myers Decl. at ¶ 25).**

45.     Plaintiff testified that her choreography and teaching of the same for the dances choreographed to the songs *Desperate Housewives*, the *Music Box Dancer*, *Guts & Glory*, and *Baby I'm a Star* (alleged "Choreographic works") was complete prior to the time she quit working with TDS, by approximately mid-December 2014 (Myers Dep. Tr. 87:12-16; 88:10-12,

Plaintiff's Answers to Defendant's Second Set of Interrogatories, attached hereto as Exhibit I, at No. 4).

**RESPONSE: Plaintiff admits that she testified that the choreography and teaching for *Desperate Houswives*, the *Music Box Dancer*, *Guts & Glory*, and *Baby I'm a Star* had been completed prior to her resignation from The Dance Shop. Plaintiff denies that all teaching was completed by approximately mid-December. As the cited passages explain, by mid-December, the choreographic work had been video-taped. Nothing in the cited record supports the notion that students had completed learning the dances by mid-December.**

46.    At that time, the parents of TDS students had paid tuition, costume fees, competition fees, additional class fees, uniform fees, registration fees, and—in some cases—solo or duet fees (Slusinksi Dec. ¶ 11 and Exhibit A attached thereto; Connell Dec. ¶¶ 12,26,29,32 and Exhibit A attached thereto).

**RESPONSE: Plaintiff states that she was only the director of the competition team and did not have any role in handling the money. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 89, *citing* Ex. 4, Myers Decl. at ¶ 14). Any accounting for payments relating to any fees or costs was wholly handled by Harold and others associated with The Dance Shop. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 90, *citing* Ex. 4, Myers Decl. at ¶ 15). Plaintiff was only made aware of issues relating to payment when a student's fees were unpaid and she was told that they could not participate due to non-payment. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 91, *citing* Ex. 4, Myers Decl. at ¶ 16).**

47.    Nicole Connell, the mother of Alyssa and step-mother of Gianna, students of TDS at the relevant time, had already paid for her solo, a duet, and a trio class, in addition to a number of other fees (Connell Dec. ¶¶1-9, 20, 25-27-29, 32, 36).

**RESPONSE:** **Plaintiff states that she was only the director of the competition team and did not have any role in handling the money. (Plf.'s LR 56(b)(3)(C) Stmt,** *infra* **at ¶ 89,** *citing* **Ex. 4, Myers Decl. at ¶ 14). Any accounting for payments relating to any fees or costs was wholly handled by Harold and others associated with The Dance Shop. (Plf.'s LR 56(b)(3)(C) Stmt,** *infra* **at ¶ 90,** *citing* **Ex. 4, Myers Decl. at ¶ 15). Plaintiff was only made aware of issues relating to payment when a student's fees were unpaid and she was told that they could not participate due to non-payment. (Plf.'s LR 56(b)(3)(C) Stmt,** *infra* **at ¶ 91,** *citing* **Ex. 4, Myers Decl. at ¶ 16).**

*Baby I'm a Star*

48.  Plaintiff testified that her choreography with respect to the dance choreographed to the song *Baby I'm a Star* became fixed in mid-December 2014, however there is no evidence of *Baby I'm a Star* in a fixed tangible medium in the record, other than TDS's 2015 Spring Recital (Myers' Dep. Tr. 88:12 – 16; Plaintiff's Answers to Defendant's Second Set of Interrogatories, attached hereto as Exhibit I at No. 4; Harold Dep. Tr. 55:3-10; See also TDS's 2015 Spring Recital DVD, submitted in hard copy to the Court as Exhibit J, at timestamp 43:15 and Plaintiff's Response to Defendants' First and Second Document Production Request, attached hereto as Exhibit K).

**RESPONSE:** **Plaintiff states that the recording of the choreography to "Baby I'm a Star" was fixed in a tangible medium during dance classes during the winter of 2014/15. (Plf.'s LR 56(b)(3)(C) Stmt,** *infra* **at ¶ 104,** *citing* **Ex. 4, Myers Decl. at ¶ 26). Plaintiff testified that video was taken for all of the copyrighted choreographic works were taken during December of the 2014/15 year and were submitted with each copyright registration including "Baby I'm a Star." (Ex. 1, Myers' Dep. Tr. at 220:4-223:21;** *See also* **Ex. 5, Plaintiff's Supplemental Responses to Defendants' Second Set of Interrogatories). For the Court's reference, a CD containing a copy of the video for "Baby I'm a Star" is being submitted to the Court as Exhibit A to the Myers Declaration.**

*TDS 2015 Spring Recital*

49.    Of Plaintiff's claimed "Choreographic Works", *Baby I'm a Star*, *Music Box Dancer*, *Desperate Housewives*, and *Guts and Glory* were performed on each of the two nights that comprised TDS's Spring 2015 Recital on May 30 and 31, 2015 (See ¶24 of Plaintiff's Complaint, attached hereto as Exhibit C).

**RESPONSE:    Admitted.**

*Alsip's Got Talent*

50.    Alsip's Got Talent is a community festival event that is free to the public and sponsored by the Alsip Park District (Connell Dec. ¶22).

**RESPONSE:    Admitted.**

51.    TDS student Alyssa performed a dance choreographed to the song "Music Box Dancer," and TDS students Alyssa & Gianna performed a dance choreographed to the song "Turn Down for What," at the "Alsip's Got Talent" show on June 20, 2015 (Defendants' Answers to Plaintiff's First Set of Interrogatories ("Defendants' Answers"), attached hereto as Exhibit L, at No. 9 [sic]; Connell Dec. ¶¶21, 30, 36).

**RESPONSE:    Admitted.**

52.    At the time Amanda Meyers left The Dance Shop, Inc. in February 2015, only 3-4 total eight counts (8-counts), representing approximately 30-40 seconds of the 2-3 minute song, had been created to *Music Box Dancer* (Connell Dec. ¶33).

**RESPONSE:    Denied.  At the time Plaintiff ceased teaching classes at The Dance Shop in February 2015, the choreography for *Music Box Dancer* was at least 85% complete.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 107, *citing* Ex. 4, Myers Decl. at ¶ 29).**

53.    Alyssa started learning the dance from Plaintiff at the beginning the dance year in September 2014(Connell Dec. ¶31). After February 2015, the remainder of "Music Box Dancer" had been completed and taught to Alyssa by Ryan Brant, another instructor at the Dance Shop, Inc (Connell Dec. ¶34).

**RESPONSE: Denied. Alyssa started learning the dance for "Music Box Dancer" later in the 2014/15 dance-year. (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 108, *citing* Ex. 4, Myers Decl. at ¶ 30). At the time Plaintiff ceased teaching classes at The Dance Shop in February 2015, the dance was 85% complete. (*Id.*)**

54. Defendants had no prior knowledge regarding TDS performing at Alsip's Got Talent, prior to the performance. Defendants did not attend, and had no involvement in preparing or teaching the students in connection with the event. Defendants did not advertise or display any signage at the event, or receive any payment of benefit in connection with the event (Defendants Answers at No. 7; Connell Dec. ¶¶36-42, 44).

**RESPONSE: Denied. Defendants have presented no evidence regarding their knowledge of the performance. Moreover, it is undisputed that Defendants participated in preparation for the performances given at Alsip's Got Talent.**

55. Alyssa and Gianna learned the dance performed to "Turn Down for What" over a period of one month in Spring of 2014. To do so, their parents paid a separate class fee for each student, paid an additional $15 per day, per student, for an average of three days of dance per week over the entire month, paid separate wardrobe fees, as well as paid separate competition fees per student. (Connell Dec. ¶¶25-26)

**RESPONSE: Plaintiff denies that the dance performed to "Turn Down for What" was taught during the Spring of 2014. The remainder of this paragraph is admitted.**

56. Alyssa won 1st place at Alsip's got talent, and was personally awarded $300 (Connell Dec. ¶43).

**RESPONSE: Admitted.**

57. Alyssa was upset that she had worked throughout the year and looked forward to performing her solo. Alyssa's mother entered her into Alsip's Got Talent for that reason, and because she had paid multiple separate fees for the choreography and teaching of the solo performance (Connell Dec.¶¶35-36).

**RESPONSE:** **Denied, in part. Plaintiff was never paid either by Defendants or Alyssa's mother for any choreography. Moreover, Pursuant to Local Rule 56.1(a)(3) Defendants were required to a statement of _material_ facts. Whether or not parents paid fees to The Dance Shop is irrelevant to the question of whether or not they or The Dance Shop infringed on Plaintiffs' copyrighted material. Paragraph 57 should be disregarded as immaterial.**

_Oak Lawn's Got Talent_

58. Of Plaintiff's claimed "Choreographic Works", _Guts and Glory_ was performed on July 4, 2015 at Oak Lawn's Got Talent by Madison, Alyssa and Abbey (Defendants' Answers at No. 9 [sic]; _see also_ Slusinksi Dec. ¶23; Connell Dec. ¶27). Plaintiff created and taught the "Guts and Glory" dance to Abbey and the other two members of the trio between September and December, 2014 (Slusinksi Dec. ¶¶25-26; Connell Dec. ¶27).

**RESPONSE:** **Admitted.**

59. Oak Lawn's Got Talent is a talent show sponsored by the Oak Lawn Park District in Oak Lawn, Illinois (Slusinksi Dec. ¶24, Connell Dec. ¶23).

**RESPONSE:** **Admitted.**

60. Pursuant to 2014-2015 dance year Company Agreement, parents had already paid the necessary fees, and completed all other terms of the Company Agreement, for their child to perform _Guts and Glory_ in Oaklawn's Got Talent (Slusinksi Dec. ¶¶22-26; Connell Dec. ¶¶27-29).

**RESPONSE:** **Denied. The Company Agreement is not a license to use original copyrighted choreographic works.**

61. The trio was not registered under TDS or Harold, and the decision to enter the trio was made independent from TDS and/or Harold (Slusinksi Dec. ¶¶27-31, Connell Dec. ¶¶27, 37-42, 44).

**RESPONSE:** **Admitted.**

62.    Neither TDS nor Harold were informed of the performance prior to the parents' registering the trio's performance (Slusinksi Dec. ¶¶27, 28, 30).  Harold learned a week prior to Oak Lawn's Got Talent of these students' intention on performing.  (Defendants' Answers at No. 8; Slusinksi Dec. ¶27).

**RESPONSE:    Denied.  Plaintiff personally witnesses public admissions made by Defendants' that The Dance Shop was fully behind the Oak Lawn's Got Talent performance and that The Dance Shop took credit for the performance including in posting on Facebook.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶¶ 109-110, *citing* Ex. 4, Myers Decl. at ¶¶ 31-32).**

63.    Harold attended Oaklawn's talent, because she had attended that event every year for at least the four previous years and she lived in the community.  (Defendants Answers at No. 8).

**RESPONSE:    Denied.  In Plaintiff's experience Harold never attended Oak Lawn talent shows during the 2012 to 2015 period before the event identified here.  (Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶ 111, *citing* Ex. 4, Myers Decl. at ¶ 33).**

64.    Defendants had no involvement in preparing or teaching the students in connection with the event.  They did not advertise or display any signage at the event, nor did Defendants receive any payment of benefit in connection with the event.  (Defendants Answers at No. 8; Slusinksi Dec. ¶¶ 29, 31, 33; Connell Dec. at ¶¶27, 37-42 ).

**RESPONSE:    Admitted.**

65.    Alyssa's mother (also Gianna's step-mother) told Myers Defendants had nothing to do with the performance (Connell Dec. ¶44).

**RESPONSE:    Denied.  The statement in paragraph 65 is hearsay and inadmissible to prove the matter Defendants assert – *i.e.* "Defendants had nothing to do with the performance."**

66.     The "Guts and Glory" trio ultimately placed second in the 2015 Oak Lawn's Got Talent show, and were awarded one $25 Target Gift Card. (Slusinksi Dec. ¶ 32; Connell Dec. ¶43).

**RESPONSE:     Admitted.**

67.     The only bases for Plaintiff's belief that Defendants were involved with the Alsip and Oaklawn talent shows in the summer of 2015, was TDS parents posting videos of their children participating in the talent shows on Facebook, as well as Harold's presence at Oak Lawn's Got Talent (Meyers' Dep. Transcript 196:20-199:7).

**RESPONSE:     Plaintiff denies that the stated bases are "[t]he only bases for**

**Plaintiff's belief."**

*Ridgefest*

68.     Of Plaintiff's claimed "Choreographic Works", *Desperate Housewives* (trio) and *Music Box Dancer* (solo) was performed on July 27, 2015 at Ridgefest by students Madison (trio), Alyssa (solo and trio) & Abbey (trio).  (Defendants' Answers at No. 9 [sic]; *see also* Susinski Dec. ¶34; Connell Dec. ¶¶45, 47).

**RESPONSE:     Admitted.**

69.     Ridgefest is an annual summer neighborhood festival in Chicago Ridge, Illinois (Slusinski Dec. ¶ 35; Connell Dec. ¶46).

**RESPONSE:     Admitted.**

70.     The parents whose children performed at Ridgefest paid separate fees, besides the dance year tuition fee, for a dance to be created and taught to the students who performed at Ridgefest (Connell Dec. ¶¶48-49; Slusinksi Dec. ¶¶36-37).

**RESPONSE:     Denied.  Plaintiff was never paid either by Defendants or any of the**

**Ridgefest performer's parents for any choreography.  Moreover, Pursuant to Local Rule**

**56.1(a)(3) Defendants were required to a statement of *material* facts.  Whether or not**

**parents paid fees to The Dance Shop is irrelevant to the question of whether or not they or**

**The Dance Shop infringed on Plaintiffs' copyrighted material.  Paragraph 70 should be**

**disregarded as immaterial.**

27

71.    FCDC parents, and their children, were upset that they had paid for classes and learned dances to be performed in the summer of 2015 under the FCDC Agreement, but were unable to do so as a result of Plaintiff's Facebook threats (Slusinksi Dec. ¶¶ 21-22, 39; Connell Dec. ¶¶51, 54). *see also* Brandt Dec. ¶9).

**RESPONSE:    Denied, in part.   Nothing was required of Plaintiff pursuant to the FCDC Agreement.   That document outlines students' commitments to the team and rules to be followed.   Plaintiff was never paid either by Defendants or any FCDC parents for her choreography.   Moreover, Pursuant to Local Rule 56.1(a)(3) Defendants were required to a statement of *material* facts.   Whether or not parents paid fees to The Dance Shop is irrelevant to the question of whether or not they or The Dance Shop infringemed on Plaintiffs' copyrighted material.   Paragraph 71 should be disregarded as immaterial.**

72.    In response, parents of TDS students requested that the students be permitted to perform the dances they had paid for and learned during the 2014-2015 dance season as a team in a non-competitive form, even though two of their routines had been taught by Plaintiff, due to the cancellation of the FCDC summer competition programs.   (Slusinksi Dec. ¶¶34-38; Connell Dec. ¶¶50-52, 54).

**RESPONSE:    Plaintiff states that none of the parents involved in this performance ever contacted Plaintiff about gaining permission to use her choreography for any event.**

73.    In an effort to satisfy upset parents and students, Harold arranged for the students to perform at Ridgefest.   The students performed a total of 10 routes [*sic*], 2 of which Plaintiff claims to be her choreographic works (Connell Dec. ¶52, Slusinksi Dec. ¶40, Harold Dec. ¶31; Defendant's Answers at No. 9).

**RESPONSE:    Admitted.**

74.    No one received any compensation for dancing at Ridgefest (Slusinksi Dec. ¶¶40-41; Connell Dec. ¶53).   Defendants did not advertise or display any signage at the event, nor did Defendants receive any payment of benefit in connection with the event (Defendants Answers at No. 8).

**RESPONSE:    Denied.   It is undisputed that Defendants received payments for classes and other matters related to preparation for the Ridgefest performance throughout**

the months leading up to that performance. Moreover, Defendants did not incur any costs relating to the creation of choreography for Plaintiff's original choreographed works that Defendants provided to the performers as part of Defendants' business relationship with those customers.

75.     As a dance instructor, Plaintiff was aware that the students were allowed to perform at community functions, such as Ridgefest, and these performances did not violate the FCDC agreement (Slusinksi ¶¶11(g), 13, 17-19); Connell ¶¶12(g), 18; See also Harold Dec. ¶32; Brandt Dec. ¶¶5-8, ¶¶13-15).

**RESPONSE:     Denied.     More specifically, Plaintiff denies that students were allowed to perform any of Plaintiff's original copyrighted choreographic works under any circumstances.     To the extent this claimed fact arises from the Company Agreement, all of the obligations to take additional classes in that document were between parents, dancers and The Dance Shop.     (Dkt. #53-1 at Ex. G (Ex. A thereto at 68-74; Plf.'s LR 56(b)(3)(C) Stmt, *infra* at ¶¶ 86, 100-101, *citing* Ex. 4, Myers Decl. at ¶¶ 11, 23).     Plaintiff was not a party in her individual capacity.     None of the benefits of these agreements were conferred to Plaintiff and all were conferred to Defendants.     (*Id.*)     Finally, the Agreements were executed only by dancers and parents and entered into between them and The Dance Shop. (*Id.*)     To the extent Plaintiff was involved in this process, it was merely in here role as a contracted instructor at The Dance Shop and not in her personal capacity.**

76.     Plaintiff is not pursuing any other action against any of the parents or students from the summer performances (Meyers Dep. Tr. 196:2-8).     Even after Plaintiff learned directly from the parents that TDS had nothing to do with Alsip and Oaklawn's got talent Plaintiff insisted that Defendants were responsible for the talent shows, and affirmed that she was not going to pursue those who actually performed (Connell Dec. ¶44, Meyers Dep. Tr. 196:16-17).

**RESPONSE:** **The issue of whether or not a copyright holder pursues claims against all infringers is immaterial to any matter before this Court on either party's motion for summary judgment.** *See* **L.R. 56.1(a)(3) (requiring a statement of "material facts"). To the extent a response is necessary, Plaintiff admits she is not pursuing claims against any students or parents.**

## II.   PLAINTIFF'S L.R. 56.1(b)(3)(C) ADDITIONAL STATEMENT OF MATERIAL FACTS

Pursuant to LR 56.1(b)(3)(C), Plaintiff Amanda Myers ("Myers") submits this additional statement of material facts requiring denial of Defendants' motion for summary judgment (Dkt. No. 51). Plaintiff also refers to her previously filed LR 56.1 (b)(3)(C) Statement of Material Facts filed on September 9, 2016 (Dkt. No. 38) as providing facts requiring denial of Defendants' motion for summary judgment and states as follows:

77.   Plaintiff operates the Precision Dance Project in Hickory Hills, Illinois and Legacy Dance Studio in Hickory Hills, Illinois, and has operated Precision Dance since the spring of 2015. (Declaration of Amanda Myers dated December 5, 2016, attached hereto as Exhibit 4 ("Myers 12/5 Decl."), at ¶ 1).

78.   Between September 2011 and February 2015, The Dance Shop engaged Plaintiff as an independent contractor to work as a dance class teacher and to work with The Dance Shop's competition team. (Myers 12/5 Decl. at ¶ 3).

79.   During the initial interview between Myers and Tina Harold, they did not discuss Myers' work history and they did not discuss the question of how dances would be choreographed. (Myers 12/5 Decl. at ¶ 4).

80.   Moreover, Myers never had a discussion with Harold in which she told Harold about any time Myers worked at a dance school under a verbal agreement providing that

whatever dances Myers created and taught would be used for competition and recitals at that school. In fact, in Myers' time teaching classes at the Dance Shop, she never discussed with Harold or anyone else the transfer to anyone of ownership of choreography that Myers created. (Myers 12/5 Decl. at ¶ 5).

81.     Harold did not explain at the interview that dance instructors were needed to choreograph anything. The subject of choreography was not brought up or discussed at all during that interview or at any other time Myers was involved with Harold and The Dance Shop. (Myers 12/5 Decl. at ¶ 6).

82.     Myers always found Harold to be vague when discussing expectations for instructors regarding show preparation and show performances. (Myers 12/5 Decl. at ¶ 7).

83.     During her tenure at The Dance Shop, Harold did not identify or speak of any interest in obtaining rights to choreography created by Myers for any purpose whatsoever. (Myers 12/5 Decl. at ¶ 8).

84.     During Myers' time at The Dance Shop, students did not spend nine months learning the dances for any recitals. Dances for the recitals would generally be introduced during the winter months and seldom earlier than November or December. (Myers 12/5 Decl. at ¶ 9).

85.     Students who enrolled in additional classes in order to participate in a solo or duet performance during the recital paid The Dance Shop and Harold for those classes. Myers never received any payments for participation in classes directly from students at The Dance Shop. (Myers 12/5 Decl. at ¶ 10).

86.     Myers did not receive any compensation for additional classes that competition-team participants took unless she actually and physically taught the class. She actually had no

direct role in those transactions; they were between the students/parents and The Dance Shop and/or Harold.  (Myers 12/5 Decl. at ¶ 11).

87.    If a student wanted to take additional classes, the transaction, or agreement was executed only by the students and their parents and entered into between them and The Dance Shop.  (Myers 12/5 Decl. at ¶ 12).

88.    The only involvement Myers had in any of the additional classes was her role as a contracted instructor and she was paid an hourly rate for her teaching time.  (Myers 12/5 Decl. at ¶ 13).

89.    While she was teaching classes at The Dance Shop, she did act as the Director of the competition team, but she was not compensated for that role and did not have any role in handling any money or transactions between students and The Dance Shop.  (Myers 12/5 Decl. at ¶ 14).

90.    Any accounting for payments relating to fees and costs paid by any student/parent was handled entirely by Harold and others at The Dance Shop.  (Myers 12/5 Decl. at ¶ 15).

91.    The only time Myers was informed of issues relating to payment was when a student's fees owed to The Dance Shop were unpaid.  When that happened, Harold would tell Myers not to let the student participate due to non-payment.  (Myers 12/5 Decl. at ¶ 16).

92.    The 2012-2013 "Company Agreement" says nothing about permitting students to perform choreographed dance routines and was never intended to.  (Myers 12/5 Decl. at ¶ 18).

93.    The word "choreography" does not even appear in the 2012-13 "Company Agreement" anywhere.  (Myers 12/5 Decl. at ¶ 18).

94.     Myers was not a party to the 2012-2013 "Company Agreement" and she never signed it and never received anything from any student/parent or The Dance Shop relating to that document.  (Myers 12/5 Decl. at ¶ 19).

95.     All payments discussed under the 2012-2013 "Company Agreement" were from students/parents to Harold and/or The Dance Shop.  (Myers 12/5 Decl. at ¶ 19).

96.     The 2012-2013 "Company Agreement" in no way conferred any right to The Dance Shop or Harold to use any of Myers' original choreographed works.  (Myers 12/5 Decl. at ¶ 20).

97.     The 2014-2015 "Company Agreement" has no language in it permitting students to perform choreographed dance routines.  (Myers 12/5 Decl. at ¶ 22).

98.     The word "choreography" does not even appear in the "Company Agreement" anywhere.  (Myers 12/5 Decl. at ¶ 22).

99.     Myers was not a party to the 2014-2015 "Company Agreement" and she never signed that agreement.  (Myers 12/5 Decl. at ¶ 23).

100.     Myers never received anything from any student/parent or The Dance Shop relating to the "Company Agreement."  (Myers 12/5 Decl. at ¶ 23).

101.     All payments discussed under the 2014-2015 "Company Agreement" were from students/parents to Harold and/or The Dance Shop.  (Myers 12/5 Decl. at ¶ 23).

102.     The 2014-2015 "Company Agreement" in no way conferred any right to The Dance Shop or Harold to use any of Myers' original choreographed works.  (Myers 12/5 Decl. at ¶ 24).

103.     After Myers left The Dance Shop in February of 2015, she communicated with both Harold and the parents of students and told them she had instructed Harold and The Dance

Shop not to use her choreography with The Dance Shop of Final Cut Dance Company. (Myers 12/5 Decl. at ¶ 25).

104. The recording of the choreography to "Baby I'm a Star" was fixed in a tangible medium during dance classes in the winter of 2014-2015. (Myers 12/5 Decl. at ¶ 26).

105. Video was taken for all of Myer's copyrighted choreographic works including the performance choreographed to "Baby I'm a Star." (Myers 12/5 Decl. at ¶ 27). A disk including the video for "Baby I'm a Star" is being submitted to the Court along with the Myers 12/5 Declaration that is attached hereto as Exhibit 4. (Myers 12/5 Decl. at ¶ 27 and Ex. A).

106. A review of the video for the performance choreographed to "Baby I'm a Star," which displays the date the video was created, shows that the video was created on November 5, 2014. (Myers 12/5 Decl. at ¶ 28).

107. When Myers left The Dance Shop in February 2015, the choreography for "Music Box Dancer" was at least 85% complete. (Myers 12/5 Decl. at ¶ 29).

108. Student Alyssa began to learn the dance for "Music Box Dancer" no earlier than November or December 2014, as was Myers' usual practice. (Myers 12/5 Decl. at ¶ 30).

109. Myers personally witnessed public admissions made by Defendants that The Dance Shop was fully behind the performance of three students in the Oak Lawn's Got Talent Show during the 2014-2015 dance year. (Myers 12/5 Decl. at ¶ 31).

110. The Dance Shop took credit for the performance of the three students in Oak Lawn's Got Talent Show and even posted about it on Facebook. (Myers 12/5 Decl. at ¶ 32).

111. In Myers' experience, Harold never attended any Oak Lawn talent show prior to the event stated above. (Myers 12/5 Decl. at ¶ 33).

Dated:  December 6, 2016                    Respectfully submitted,

                                            AMANDA MYERS

                                            By:  ___/s/ David S. Becker_____
                                                 One of her attorneys

                                                 David L. Ter Molen
                                                 David S. Becker
                                                 FREEBORN & PETERS LLP
                                                 311 South Wacker Drive, Suite 3000
                                                 Chicago, Illinois 60606
                                                 Phone: (312) 360-6000
                                                 E-mail:    dbecker@freeborn.com
                                                            dtermolen@freeborn.com


                                                 **Attorneys for Amanda Myers**

## <u>CERTIFICATE OF SERVICE</u>

I, David S. Becker, an attorney, hereby certify that a true and correct copy of the foregoing **PLAINTIFF'S LOCAL RULE 56.1(b)(3)(B) RESPONSE TO DEFENDANTS' STATEMENT OF PURPORTEDLY UNDISPUTED MATERIAL FACTS AND LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACT REQUIRING DENIAL OF SUMMARY JUDGMENT** was served upon the following counsel of record this 6th day of December, 2016, via e-mail and first class U.S. Mail:

> Jemelle D. Cunningham
>  E-mail: j.cunningham@ladlawgroup.com
> Molly Gantman
>  E-mail: mgantman@ladlawgroup.com
> LAD LAW GROUP, P.C.
> 203 N. LaSalle St. Suite 2100
> Chicago, Illinois 60601
> (312) 252-3085

*/s/ David S. Becker*
