AMANDA MYERS,               )
                                    )
          **Plaintiff**         )
         v.                   )      **No.  15 C 7418**
                                    )
**CHRISTINA R. HAROLD, and**    )      **Judge Rebecca R. Pallmeyer**
**THE DANCE SHOP,  INC.,**        )
                                    )
         **Defendants.**      )

## MEMORANDUM OPINION AND ORDER

Plaintiff Amanda Myers is a dance instructor and choreographer.  In this lawsuit, Myers alleges that Defendants Christina Harold and the company she owns, The Dance Shop, Inc. ("TDS"), infringed Myers's copyright in dances that Myers created while Myers worked as a dance instructor at TDS from 2011 to 2015.  Myers choreographed dances for students on TDS's dance team.  Myers left her position at TDS before the 2014–2015 dance season was over, however, and, at TDS's end-of-season recital and at three summer festivals, TDS students performed dances that Myers claims to have choreographed in 2014 and 2015.  Myers alleges that Harold and TDS are liable for copyright infringement and unjust enrichment for profiting from, organizing, and contributing to these performances.  Defendants seek summary judgment, arguing that some of the works are not eligible for copyright; that the dances were works made for hire; or that TDS had a license to perform them.  Myers disputes these defenses, and seeks summary judgment in her favor on certain claims.  For the reasons stated below, Defendants' motion is denied and Myers's motion is granted in part and denied in part.

## BACKGROUND

### I.  Myers and The Dance Shop

Amanda Myers is a choreographer.  (Pl.'s LR 56.1 Statement of Material Facts in Supp. of Mot. for Summ. J. ("PSOF") [38] ¶¶ 1–3.)[1]  Tina Harold is the president and sole owner of

---

[1]      Defendant has marked this and other facts as undisputed "solely for the purpose of responding to Plaintiff's motion for summary judgment."  (Defs.' Resp. to PSOF ¶ 1 n.1.)  The court deems these facts admitted for purposes of ruling on Defendants' own motion as well.

The Dance Shop, which is located in Chicago Ridge, Illinois and provides dance classes to adults and children. (Defs.' Joint Resp. to Pl.'s L.R. 56.1(a) Statement of Material Facts in Supp. of Mot. for Summ. J. ("Defs.' Resp. to PSOF") [56] ¶¶ 4, 6–7.) In September 2011, Harold posted an advertisement for a dance instructor on Craigslist.com. (Defs.' L.R. 56.1(a) Statement of Facts ("DSOF") [53] ¶ 10.) The ad reads:

> Dance Instructor needed for new dance studio opening in Sept.
>
> Teaching Tap, Jazz, and Ballet to children 3 -17 years of age. Must be strong in Tap. Serious Applicants only.
>
> Part time on Saturdays and two nights during the week.

(Ex. 3 to Pl.'s L.R. 56.1(b)(3)(B) Resp. to Defs.' Fact Statement [55-4].)[2] Myers responded to the ad, and Harold interviewed her. Harold testified that she explained to Myers that the dance instructor was expected to create dances for the students to perform. (Dep. of Tina Harold, Ex. 2 to Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Harold Dep.") [37-2] 100:4–16; *see* Decl. of Tina Harold, Ex. B to DSOF [53-1 at p. 5] ("Harold Decl.") ¶ 9.) Myers denies that there was any discussion of choreographing dances during the interview. (Pl.'s L.R. 56.1(b)(3)(B) Resp. to Defs.' Fact Statement ("Pl.'s Resp. to DSOF") [55] ¶ 12.) Myers was hired for the position and began teaching dance classes at TDS that same month. (PSOF ¶ 12; DSOF ¶ 6.)

TDS's "work for hire" defense turns, in part, on the nature of Myers' employment relationship with TDS. The parties dispute many of the facts surrounding this relationship; the most prominent dispute concerns precisely what work TDS paid Myers to perform. Myers was paid an hourly rate that changed over time (*see* Defs.' Resp. to PSOF ¶ 20; Pl.'s Resp. to DSOF ¶ 14)), and the parties agree that she was paid for the hours that she taught dance, and for various office administrative tasks. (*See* Defs.' Resp. to PSOF ¶ 20; Pl.'s Resp. to DSOF ¶¶ 13, 15.) Myers also testified that Harold gave her bonuses (she could not recall the amounts) for each full dance season that she taught at TDS. (*Id.* at 54:7–55:22.)

---

[2] The ad also describes an opening for a yoga instructor position, not relevant to this case.

The parties disagree, however, about whether Myers was compensated for time she spent choreographing dances to teach in her classes. This issue is whether the choreography occurred during class time, which Myers was paid for, or outside of class time, during uncompensated hours. Defendants contend that the choreography occurred during class time, and that Myers's hourly wage therefore compensated her for the time spent choreographing dances. (Defs.' Resp. to PSOF ¶ 20; Harold Dep. 66:24–67:12.) In support, Defendants cite Myers's testimony that she spent time "develop[ing]" dance moves "into a routine" during class time:

> Q: What were you hired to do at The Dance Shop?
> A: Teach dance.
> Q: To teach dance routines or dance techniques?
> A: It was just teach dance.
> Q: Does that mean teaching dance moves?
> A: I mean it all goes along with that. You teach technique, you teach move terminology and you develop all that into a routine.
> Q: Okay. Were you hired to teach routine?
> [Objection omitted]
> A: Yes.

(Dep. of Amanda Myers, Ex. B to Defs.' App. in Opp'n to Mot. for Summ. J. ("Myers Dep.") [58-2] 70:16–71:6.). Defendants acknowledge that Myers prepared some choreography prior to the first day of class,[3] but they point out that Myers then refined choreographed routines during class time. (*See* Defs.' Joint Resp. to Pl.'s L.R. 56(1)(b)(3)(C) Additional Statement of Material Facts ("Defs.' Resp. to PSOAF") [62] ¶ 84.) Myers herself acknowledges that she refined her choreography during class time: she explained that she went to class "with pre-choreographed routines which may or may not work once you actually put it on the kids[,]" and she and her students would "work on combinations and dances" in class. (Myers Dep. 45:12–19.) But some of the time she spent preparing the "pre-choreographed routines" was outside the classroom, Myers asserts. (*Id.* at 119:15–120:6.) And although Myers was paid for her self-reported hours

---

[3] Defendants also claim that other "TDS instructors generally create choreography during their studio time with students[,]" (Defs.' Joint L.R. 56.1(b) Statement of Additional Material Facts Opposing Pl.'s Mot. for Summ. J. [57] ¶ 9), but Defendants have not explained how this is relevant.

of work, she did not report time outside of the dance classes devoted to choreographing these routines. (*See id.* at 72:4–73:1.) As a result, Myers contends, she was paid only for her teaching time, not for time she spent choreographing.[4] (*See id.* at 45:12–19.)

Defendants interpret Myers's testimony that she was paid only for class time as support for their position that she was therefore paid for all of her choreography time. (*See* DSOF ¶ 15; Defs.' Resp. to PSOF ¶ 20 (citing Myers Dep. 54:2–6). Defendants also emphasize that Myers was paid for all the time she reported to TDS (Defs.' Resp. to PSOF ¶¶ 20, 23), and note her testimony that she did not think she was allowed to report time that she spent on administrative tasks for TDS. (*See* Myers Dep. 72:13–73:1, 115:19–116:7.)[5] That testimony is not inconsistent with Myers's claim, however, that she also performed choreography outside of class time, did not report that time, and was not paid for it.

In addition to the issue of compensation, the parties dispute the amount of control that Christina Harold and TDS exercised over Myers's choreography. Harold testified that she made the "last decision" about dances that TDS students could perform:

> Q: And you didn't control what she was doing in connection with that choreography, correct?
> A: Well, I do control it, yes. I mean, it's up to me to say yes or no.
> Q: Yes or no to what?
> A: If the choreography is acceptable. I make the last decision.
> Q: So basically what you mean by that is if there were something that might be a little bit too provocative or music that would be R rated, you would say we can't use that for the recital?
> A: Yes.

(Harold Dep. 51:8–19.) Harold acknowledged that she could not recall any instance in which she disapproved choreography prepared by Myers or any other TDS dance instructor. (*Id.* at

---

[4]     At some point during her employment, Myers was also paid for "extra duties," such as creating recital programs and finding performance opportunities for dance students. (Myers Dep. 44:19–45:11, 72:13–73:1.)

[5]     Defendants also cite to the declaration of another dance instructor, Ryan Brandt, who claims to have been compensated for time spent teaching and choreographing dances. (Decl. of Ryan Brandt, Ex. E to DSOF [53-1 at p. 58] ¶¶ 5–8, 15.) But Defendants do not explain why Myers's expectations were the same as Brandt's, which is the only reason Brandt's expectations would be relevant.

51:20–24, 53:1–13.) Nevertheless, it was Harold, Defendants assert, who determined the type of dance to be choreographed (such as tap, jazz, lyrical, ballet, or hip hop), and the ages and skill levels of the students who would perform the dance. (Defs.' Resp. to PSOF ¶ 46.)

Other circumstances regarding Myers's and TDS's working relationship are disputed, as well. Myers received a W-2 for 2012, but Defendants issued a 1099-MISC for 2013, 2014, and 2015. (PSOF ¶ 28.) For 2013, 2014, and 2015, TDS neither withheld taxes from Myers's checks nor provided her with benefits. (*Id.* at ¶ 30.) Harold assigned the classes each instructor would teach, based on the instructor's availability, strengths, weaknesses, and teaching preferences. (Defs.' Joint L.R. 56.1(b) Statement of Additional Material Facts Opposing Pl.'s Mot. for Summ. J. ("DSOAF") [57] ¶ 13.) When a dance teacher was unavailable for a class, unless Harold could find another TDS instructor to cover the class, the teacher him/herself was obligated to find a substitute, subject to Harold's approval. (Second Decl. of Tina Harold, Ex. A to Defs.' App. in Opp'n to Mot. for Summ. J. [58-1 at p. 1] ¶ 26.) Harold paid the teachers, including substitute teachers, directly (*id.*), and TDS students paid TDS and Harold; that is, dance students did not pay instructors directly. (Defs.' Resp. to PSOAF ¶ 85.)

TDS follows a "dance season" that corresponds with the academic year. (DSOF ¶ 7.) The season culminates in a "Spring Recital," at which TDS students perform dances for their families and friends. (Defs.' Resp. to PSOF ¶ 7; Pl.'s Resp. to DSOF ¶ 8.) Myers acknowledged that she understood while she was teaching dance routines that those routines would be performed at TDS recitals. (Myers Dep. 71:8–17.) Ryan Brandt, another instructor at TDS, averred that TDS instructors expected that their choreography would be performed by TDS students at various events. (DSOF ¶ 43.) Neither Brandt nor Myers states whether they expected that to continue after they left TDS; Myers was not asked this question, and Brandt was not deposed (nor is it clear that Brandt's testimony would be relevant to Myers's expectations and relationship with TDS).

## II.     Final Cut Dance Company

In fall 2012, TDS formed a dance competition team known as "Final Cut Dance Company" ("FCDC").  (DSOF ¶ 16; PSOF ¶ 22.)  For the 2014–15 dance year, the only dance year at issue, Myers taught TDS classes only to students who were FCDC participants (Pl.'s Resp. to DSOF ¶ 17; PSOF ¶ 24); Defendants believe that Myers should therefore have expected that students would perform her dances at FCDC competitions.

Myers created a document entitled "Final Cut Dance Company Contract Agreement" ("FCDC Contract") for students who wanted to compete on the team.[6]  (Myers Dep. 75:16–76:11.)  Defendants rely heavily on this "agreement," so the court devotes some attention to it here; but, as explained below, this commitment by the students to the dance studio has minimal relevance in the dispute between Myers and Defendants.  Both the student and his or her parent were required to sign the document, but no one from TDS countersigned it.  (Ex. A to Ex. G to DSOF ("FCDC Contract") [53-1 at p. 68].)[7]  The document lists a number of "guidelines and regulations" for students: they were required to attend all classes and practices with a limited number of absences; participate in fundraising events; wear appropriate attire; and refrain from participation in any other dance team or class.  (*Id.*)  The document also describes required fees: an annual registration fee, a fee for each class, costume fees, and competition entry fees. (*Id.*)  Students committed to perform dances in four competitions "as well as various performances throughout the dance year," and to "participate in a team production dance at every competition."  (*Id.*)  A student who expected to be absent or late was required to call Myers.  (*Id.*)  Myers expected to remove dancers from the FCDC team if they did not abide by the conditions; any student removed from the FCDC team remained eligible to "participate in

---

[6]     Though Myers created the document, it is not clear what prompted her or TDS to require students to make this commitment.

[7]     The court cites to the 2014–2015 version of the FCDC Contract; though the 2012–2013 version of the agreement is also in the record (Ex. B to Ex. G to DSOF [53-1 at p. 75]), no party contends that the 2012–2013 version was in operation at the time of the allegedly infringing conduct.

those dances" at the TDS school-wide recitals, but not to compete with the team.  (*See* Myers Dep. 75:16–76:4.)

Harold averred that the FCDC Contract "included a provision permitting FCDC participants to perform the dances they learned throughout the dance year, so long as they did not compete with other teams[.]"  (Harold Decl. ¶¶ 12–13; *see* DSOF ¶ 32.)  In fact, however, the FCDC Contract contains no such provision; while the Contract prohibits students from performing with other dance teams, no provision of the FCDC Contract makes any reference to the specific dances, let alone any reference to permission to perform choreographed works.

Defendants now insist that the FCDC was a contract binding on Myers, though their position on this issue has evolved.  Harold initially testified that there was no written agreement between TDS and Myers (other than the terms in the Craigslist ad).  (Harold Dep. 38:23–40:13, 100:13–22.)  After her deposition, however, she claimed that TDS was a party to the FCDC Contract, in which TDS was paid "in exchange for providing all facilities necessary to effectuate the purpose of the Agreement."  (Harold Decl. ¶¶ 20, 30; *see* DSOAF ¶ 11.)  Defendants point to the beginning of the FCDC Contract, which they contend shows Myers's agreement to provide services:

> My commitment to all of my dancers is to teach and to guide you into becoming an outstanding, reliable, and trustworthy team member.  You are part of a team, and without your commitment, we cannot be all we want to be!  It is a commitment not only for each dancer, but to the team.
> I am very excited to see what the 2014–2015 year has in store for our team members.  In the next pages, you will need to read all of the guidelines and regulations you need to know to be a loyal asset to our team.

(FCDC Contract.)  Defendants further claim that Myers has acknowledged she was a party to the FCDC Contract, emphasizing Myers's testimony that the FCDC Contract

> was between me, Tina, or The Dance Shop, and the parents and students just to make sure that we had everything in place [and] in order, there's no drama about what the rules are, who pays what, and just basically it tells everything about the whole season and what to expect.

(Myers Dep. 76:12–18.)  This testimony does not, however, support the notion that Myers and TDS exchanged mutual promises in the "contract;" instead, it refers to the students' and parents'

commitment to both TDS and Myers.  In any event, Myers's testimony about this document is not admissible to establish its content or legal effect.  FED. R. EVID. 1002.[8]

## III.    The Choreographed Dances

On February 25, 2015, Myers resigned her position as a dance instructor at TDS. (PSOF ¶ 51; DSOF ¶ 34.)  This dispute centers on whether Myers owns the copyright to five dances she claims to have choreographed prior to that date.  The dances at issue are known as *Desperate Housewives*, *Guts & Glory*, *Piece Choreographed to the Song "Baby I'm a Star"* ("*Baby I'm a Star*"), *Music Box Dancer*, and *Turn Down for What*.  (Pl.'s Resp. to DSOF ¶ 3; Defs.' Resp. to PSOF ¶ 35.)  Plaintiff asserts that "[f]or the dance season of 2014–2015, Myers created, independently, wholly original dance choreography for dances while an independent contractor at The Dance Shop."  (PSOF ¶ 35.)  Defendants object to this statement as containing a number of legal conclusions, and they admit only that Plaintiff testified that she choreographed the dances in question.  (Defs.' Resp. to PSOF ¶ 35.)  Yet, as discussed below, it is undisputed that Plaintiff choreographed at least some of these dances.[9]

Defendants effectively concede that Myers choreographed *Desperate Housewives* and *Guts & Glory*: they admit not only that Myers testified that she choreographed these dances, but also that the two dances were in fact "created by Myers" before February 25, 2015.[10]  (Defs.' Resp. to PSOF ¶¶ 36–37, 40.)  The program for the 2015 TDS recital (three months after Myers's resignation) lists Myers as sole choreographer for each of these two dances.  (Ex. 11 to

---

[8]    Parents of students who participated on the FCDC team also described the contents of the FCDC Contract.  (*See* Decl. of Kathy Slusinksi, Ex. G to DSOF [53-1 at p. 62] ¶ 11; Decl. of Nicole Connell, Ex. H to DSOF [53-1 at p. 78] ¶ 12.)  This testimony is also not admissible.  FED. R. EVID. 1002.

[9]    Without identifying any particular dance, Harold conceded that Myers "created the choreography that was performed by the dance team."  (Harold Dep. 48:8–49:12.) The court presumes that the five dances were to be performed by the dance team, because, as noted above, Myers only taught FCDC dancers during the 2014–2015 dance season.

[10]    Myers produced videos of *Desperate Housewives* and *Guts & Glory* that she claims were filmed before February 25, 2015.  (Defs.' Resp. to PSOF ¶ 38.)  Defendants concede only that videos "appear to have been filmed" before this date (*id*), but there is no evidence disputing this fact and the court deems it admitted.

Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Recital Program") [37-11].) It is therefore undisputed that Myers choreographed these two dances before she left TDS.

*Baby I'm a Star* presents different circumstances. The 2015 TDS recital program lists both Myers and another dance teacher, Ryan Brandt, as choreographers of this dance (Recital Program), but Defendants admit that *Baby I'm a Star* was "created by Myers" (*id.* at ¶ 37), so there is no genuine dispute about whether Myers choreographed the dance. Instead, Defendants dispute that *Baby I'm a Star* was fixed in a tangible medium (that is, recorded on video) before Myers left TDS, and argue that this dance is therefore ineligible for copyright protection under 17 U.S.C. § 102. (DSOF ¶ 48; Defs.' Resp. to PSOF ¶ 36.)

Myers responded by submitting a video that she claims was made on November 5, 2014 (before Myers left TDS) and shows dancers performing *Baby I'm a Star*. (Ex. A to Ex. 4 to Pl.'s Resp. to DSOF [55-6].) The video, submitted as part of the summary judgment record, does show part of a dance, and was recorded on November 5, 2014. (*See id.*) Defendants object to consideration of this video on the ground that it was not produced in response to a discovery request for all such videos, and because it is less than 30 seconds long. (Defs.' Resp. to PSOAF ¶¶ 104–06.) Myers's failure to produce the video in discovery is disappointing, but this appears to be a function of oversight, not bad faith.[11] At the court's request (Order, Apr. 19, 2017 [66]), Myers produced a video which shows the dance in its entirety. (*See* Decl. of David S. Becker [67].) Having reviewed the second video, the court concludes (1) that the initial video provided to the court is in fact an excerpt of the second, longer video, and (2) that the dance being performed on the November 5, 2014 video is largely identical to the dance performed in the TDS recital video, which Defendants admit shows *Baby I'm a Star*. (*See* DSOF ¶ 48.) The court therefore finds that *Baby I'm a Star* was fixed in a tangible medium on November 5, 2014.

---

[11] Plaintiff notes that the FCDC Contract was also not produced during discovery, although that document is the centerpiece of Defendants' argument. The parties' discovery failures are puzzling, but the court sees no evidence of bad faith and declines to exclude these materials.

Defendants do not contest any other fact relating to the choreography of *Baby I'm a Star*. There is therefore no genuine dispute that Myers choreographed *Baby I'm a Star* before she left TDS.

The fourth dance at issue here is *Music Box Dancer*. Myers initially claimed to have choreographed that entire dance, though she now claims to have choreographed 85% of it.[12] (Pl.'s Resp. to DSOF ¶¶ 45, 52.) Defendants dispute this, citing the declaration of a parent of one of the students who performed it; without providing the source of her knowledge of the issue, the parent claims that Myers choreographed only thirty to forty seconds of the two-to-three-minute dance. (Decl. of Nicole Connell, Ex. H to DSOF [53-1 at p. 78] ¶ 33.) According to this parent, another TDS dance instructor, Ryan Brandt, choreographed the rest of *Music Box Dancer*. (*Id.* at ¶ 34.) Though she is listed as a co-choreographer of *Music Box Dancer* in the recital program (Recital Program), Brandt's own declaration in this case makes no mention of that dance. (*See generally* Decl. of Ryan Brandt, Ex. E to DSOF [53-1 at p. 58].) There is thus minimal support for the contention that anyone other than Myers choreographed *Music Box Dancer*. *Cf.* 17 U.S.C. § 101 (for a work to be a "joint work," authors must "inten[d] that their contributions be merged into inseparable or interdependent parts of a unitary whole"); *Ty, Inc. v. Publications Int'l, Ltd.*, 333 F. Supp. 2d 705, 712 (N.D. Ill. 2004) ("[A] work is not considered transformative if it serves the same purpose as plaintiff's original or derivative works."). Myers has not moved for summary judgment regarding this dance, and Defendants are not entitled to summary judgment on whether Myers's status as its choreographer. .

As for *Turn Down for What*, there is little evidence in the record regarding who choreographed that dance. Myers has not moved for summary judgment on her claim of infringement of this dance, and did not testify about it in her deposition. It was not performed at the TDS recital, and is not mentioned in the recital program. Without any such evidence, the court cannot determine who choreographed *Turn Down for What*.

---

[12] Presumably the remaining 15% was choreographed by Ryan Brandt, who is listed as the second choreographer in the recital program. (Recital Program.)

During the weeks after she left TDS, Myers sent Harold three text messages asking that TDS stop using her choreography. (Ex. 7 to Pl.'s Mem. in Supp. of Mot. for Summ. J. [37-7].) Myers and Harold had never discussed ownership of the choreography that Myers created for her dance classes until Myers stopped teaching at TDS. (PSOF ¶ 17.)[13] Defendants claim that after Myers left TDS, "FCDC was unable to compete in any performances during the 2014–2015 dance season."[14] (DSOF ¶ 40.) Myers disputes this fact, but cites only to non-competitive shows in which FCDC members later performed. (Pl.'s Resp. to DSOF ¶ 40.) Myers admits, however, that she told parents of FCDC students—the court does not know how or when she contacted them—that they could not use her choreography in competitions. (*Id.* at ¶ 44.)

## IV. The Allegedly Infringing Performances

On May 30 and 31, 2015, TDS held a recital, for which it charged $15 per seat. (PSOF ¶¶ 61–62.) TDS also sold pre-orders of DVDs of the recital for $25 each (presumably people paid in advance for a DVD copy of the video that was recorded at the recital). (*Id.* at ¶ 62.) At each night of the recital, TDS students performed *Baby I'm a Star*, *Music Box Dancer*, *Desperate Housewives*, and *Guts & Glory*. (DSOF ¶ 49.) The recital program lists Amanda Myers as the choreographer of *Desperate Housewives* and *Guts & Glory*, and Amanda Myers and Ryan Brandt as the choreographers of *Baby I'm a Star*[15] and *Music Box Dancer*. (Recital Program.) The program also listed "directors" of each of the dances. (*Id.*) Defendants acknowledges that directors were not choreographers, but instead helped TDS students practice the dances. (PSOF ¶ 68.) The costumes and sets used for the recital differed from

---

[13] Myers also points out that Harold testified that she never "assert[ed] ownership" of any choreography that Myers developed. (Harold Dep. 127:16–24.)

[14] Defendants do not explain why this is true; if the team did not compete simply because it no longer had a coach, this fact is irrelevant. If, however, FCDC did not compete because Myers told Defendants that they could not use her dances, such an action may be a tacit admission by Defendants that Myers owned the copyrights.

[15] Harold could not recall whether Brandt made some alterations to Myers's choreography of *Baby I'm a Star*. (Harold Dep. 59:15–60:6.)

those in the videos that Myers had recorded; for example, Myers's videos showed the dancers in a dance studio wearing athletic gear, while in the recital they were on a stage wearing leotards and dresses. (DSOAF ¶¶ 27–30.)

On June 20, 2015, TDS students performed *Music Box Dancer* and *Turn Down for What* at a talent show called "Alsip's Got Talent." (DSOF ¶ 51.) Defendants claim that they did not know these students would perform at Alsip's Got Talent, but Plaintiff contends that Defendants helped the students prepare for the performance. (Pl.'s Resp. to DSOF ¶ 54.)[16] On July 4, 2015, TDS students performed *Guts & Glory* at another talent show, "Oak Lawn's Got Talent." (DSOF ¶¶ 58–59.) Defendants claim that Harold did not learn that the performance was planned until after the students had registered, citing the declaration of a parent of one of the students. For her part, without offering specifics, Myers asserts she "personally witnessed public admissions made by Defendants that The Dance Shop was fully behind the performance" and that she saw TDS's post about it on Facebook. (Pl.'s Resp. to DSOF ¶ 62; Decl. of Amanda Myers, Ex. 4 to Pl.'s Resp. to DSOF [55-5] ¶ 31–32.) Myers admits, however, that TDS did not help the students prepare for this performance. (Pl.'s Resp. to DSOF ¶ 64.)

On July 27, 2015, TDS students performed *Desperate Housewives* and *Music Box Dancer* at a summer festival called "Ridgefest." (DSOF ¶¶ 68–69.) Harold had arranged this performance, which Defendants claim was to satisfy FCDC students who were upset that they had not competed in dance competitions that year. (*Id.* at ¶ 73; *see id.* ¶¶ 71–72.)

## V.    The Instant Lawsuit

On August 17, 2015, Myers applied to register *Desperate Housewives*, *Guts & Glory*, and *Baby I'm a Star* with the United States Copyright Office, and the Copyright Offices issued

---

[16]    In support of their statement that they did not have this knowledge, Defendants cite only their interrogatory answers (they also cite a declaration from a parent of one of the students, but have not explained how this parent could testify to Harold's knowledge). Myers, for her part, does not cite to any evidence concerning Harold's advance knowledge that students would perform at Alsip's Got Talent. (Pl.'s Resp. to DSOF ¶ 54.)

certificates of registration.[17] (*See* PSOF ¶ 49; Ex. 8–10 to Pl.'s Mem. in Supp. of Mot. for Summ. J. [37-8], [37-9], [37-10].) On August 24, 2015, Myers filed this lawsuit, alleging direct copyright infringement for the performances at the recital (Count I), contributory copyright infringement for the performances at the summer talent shows (Count II), and unjust enrichment (Count III). Defendants pleaded seven affirmative defenses: (1) failure to state a claim; (2) unclean hands; (3) waiver; (4) after-acquired evidence; (5) unjust enrichment (apparently on the theory that Myers was already compensated for her choreography); (6) work-for-hire; and (7) "the Fair Use Doctrine, including but not limited to the First Sale Doctrine and/or Joint Works of Authorship Doctrine." (Defs.' Joint Am. Answer [33].) Defendant has moved for summary judgment on all counts. Plaintiff has moved for summary judgment on its direct infringement with respect to the recital performances[18] of *Desperate Housewives*, *Guts & Glory*, and *Baby I'm a Star*, and on Defendant's affirmative defenses.

## DISCUSSION

"Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016) (citing FED. R. CIV. P. 56(a)). When both parties move for summary judgment, the court "look[s] to the burden of proof that each party would bear on an issue of trial" and "require[s] that party to . . . affirmatively . . . establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). The court must "view all facts and inferences in the

---

[17] The court is uncertain as to the effective date of the registrations. Both parties apparently agree that the effective dates are June 1, 2015 (Defs.' Resp. to PSOF ¶ 50), but the court does not see how the date of approval and the effective dates could be before the date the applications were submitted. *See Have a Question About Copyright Registration?*, U.S. COPYRIGHT OFFICE, https://www.copyright.gov/fls/sl09.pdf (last visited August 18, 2017) (effective date of copyright registration is the date that the Copyright Office receives all required elements of the application). The certificates themselves state an effective date of June 1, 2016. (Ex. 8–10 to Pl.'s Mem. in Supp. of Mot. for Summ. J. [37-8], [37-9], [37-10].)

[18] In the complaint, Count I refers to both the recital and "other performances" (Compl. [1] ¶ 38), but Plaintiff only addresses the recital in her motion for summary judgment. (Pl.'s Mem. in Supp. of Mot. for Summ. J. [37] 9.) The court therefore assumes that Count I refers only to the recital.

light most favorable to the nonmoving party on each motion." *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787 (7th Cir. 2015) (citation and quotation marks omitted).

## I.    Direct Copyright Infringement

Subject to limited exceptions, such as fair use, the owner of a copyrighted choreographic work has the exclusive right to perform the work publicly, distribute copies of the work, and prepare derivative works based on the copyrighted work.  17 U.S.C. § 106; *see* 17 U.S.C. § 107.  Defendants performed at least some of the dances publicly at the spring recital, by organizing the recital, charging admission, and selling DVDs of the recital.  17 U.S.C. § 101; *see Flava Works, Inc. v. Gunter*, 689 F.3d 754, 760 (7th Cir. 2012); *cf. Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 78 (5th Cir. 1987); *Broad. Music, Inc. v. Prana Hosp., Inc.*, 158 F. Supp. 3d 184, 192 (S.D.N.Y. 2016).  Defendants do not dispute this; instead, they dispute that Plaintiff owns the copyright to the dances, or alternatively, contend that Plaintiff granted Defendants a license to perform them.

Defendants' challenge to Myers's claim of ownership of the copyright rests on two arguments: that one of the dances was not fixed in a tangible medium, and that all of the dances were works made for hire.  The first argument need not detain the court: Defendants argue that Plaintiff does not own the copyright to *Baby I'm a Star* because Plaintiff has not proved that it was fixed in a tangible medium before the recital, but the videos that Plaintiff has produced to the court defeat that contention.  They show that Myers choreographed *Baby I'm a Star* before she left TDS.  Notably, Defendants do not move for summary judgment on the grounds that Myers did not choreograph *Music Box Dancer* and *Turn Down for What*—indeed, in their memorandum in support of summary judgment, Defendants admit that Plaintiff "created" *Music Box Dancer* and *Turn Down for What.  (see* Defs.' Joint Mem. in Supp. of Mot. for Summ. J.

("Defs.' Mem.") [52] 11.)  Defendants are not entitled to summary judgment on the grounds that Myers did not choreograph the dances.[19]

### A.    Work Made for Hire

Defendants also argue that Plaintiff does not own the copyrights to the other dances because the dances were works made for hire.  A work is made for hire if it is:

> (1) a work prepared by an employee within the scope of his or her employment; or
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. . . .

17 U.S.C. § 101.  Defendants argue both that Plaintiff was an employee and that Defendants commissioned the dances in a written instrument, that is, the FCDC Contract.  Plaintiff responds that Myers was an independent contractor, not an employee, and the FCDC Contract was not an express work-for-hire agreement.

---

[19]    Defendants claim that "Plaintiff admits that the choreography performed at the performances challenged in this lawsuit 'wasn't [hers]'."  (DSOAF ¶ 33 (alteration in original) (purportedly quoting Myers Dep. 220:8).)  But this part of Myers's deposition does not contain the quotation.  The court assumes that the cite refers to a different part of Myers's deposition:

> Q:    As you sit here today, can you think of any other ways you've been monetarily damaged by the use of the Choreographic Works at the spring 2015 recital?
> [Objection omitted]
> A:    I don't know.
> Q:    What about the dances being used at the summer performances or summer activities, how have you been damaged as a result of the dances being performed there?
> [Objection omitted]
> A:    I just feel that since *it wasn't mine* and I didn't rehearse it, I didn't clean it, that it could have damaged my reputation as a choreographer.

(Myers Dep. 236:14–237:10 (emphasis added).)  In this context, "it" likely refers to the performances themselves and Myers's lack of involvement in the performance of her choreography.  The court sees no admission that Myers did not create the dances.

### 1. Work Prepared by an Employee

The Supreme Court has set forth a non-exhaustive factor test to determine whether a creator of a copyrighted work is an employee; the factors include:

> the hiring party's right to control the manner and means by which the product is accomplished[;] . . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751–52 (1989). Myers analogizes to *Natkin v. Winfrey*, 111 F. Supp. 2d 1003, 1006 (N.D. Ill. 2000), a case that, while not binding, is particularly instructive in applying the *Reid* test. The defendants paid the plaintiffs, two professional photographers, to photograph the host and guests who appeared on *The Oprah Winfrey Show*. *Id.* Both plaintiffs used their own equipment and processed their own film, but they "had no control over the position or appearance of their subjects . . . , the layout and design of the sets, or even the lighting of the set[.]" *Id.* The photographers did, however, have "complete discretion over the technical aspects of the shoot: they chose which cameras, lenses, and film to use; the appropriate shutter speed, aperture settings, and timing for the shots; and how to frame the images." *Id.* The photographers billed the defendants a flat fee for each show they photographed; the defendants did not withhold taxes or provide benefits, and they reported the payments on 1099 forms (not W-2 forms). *Id.* at 1006–07. The plaintiffs were referred to as "staff photographers," and received paid parking, access to the employee cafeteria, and invitations to staff functions. *Id.* at 1007. On occasions when the photographers were unable to photograph the show themselves, they would hire and pay a substitute, for which the defendants would reimburse them. *Id.*

Applying the *Reid* factors, the district court found no genuine dispute about the photographers' status as independent contractors, not employees. *Id.* at 1008–10. The court identified as "most important[]" the fact that "neither photographer was ever treated like an employee in terms of compensation, benefits, and taxes." *Id.* at 1008–09. The court also observed that "[b]oth men were highly skilled professionals specializing in live-action photography; both used (and insured) their own equipment; and both exercised discretion in hiring substitute photographers when they themselves were unavailable and paid those substitutes." *Id.* at 1008. As to the degree of control, the court noted that "all of the parties exercised control over the manner and means of production to some extent[,]" but because the plaintiffs controlled the technical aspects of the photographs and the ultimate image, that factor weighed in the plaintiffs' favor. *Id.* at 1009.

Some factors did weigh in favor of the defendants: the studio was a business;[20] the photographers had worked with the studio for a long period of time; they were referred to as "staff photographers;" and the defendants controlled the location and timing of the work. *Id.* at 1009. Whether making the photographs was part of the defendants' regular business was disputed, but even resolving this factor in the defendants' favor, all factors that favored the plaintiffs had greater weight. *Id.* at 1009–10. The court emphasized the defendants' tax treatment of plaintiffs and observed that "[the defendants] may not obtain the benefits associated with hiring an independent contractor and, at the same time, enjoy the advantages of treating that person as an employee; [they] must choose." *Id.* at 1009; *accord, Aymes v. Bonelli*, 980 F.2d 857, 862 (2d Cir. 1992) (although the defendant "had the right to control the manner in which [the copyrighted work] was created[,]" the defendant's failure to give the plaintiff "any employment benefits or to pay any of his payroll taxes [wa]s highly indicative that [the plaintiff] was considered an outside independent contractor"; defendant "should not in one

---

[20]     Neither *Reid* nor *Natkin* discusses this factor in detail, but it appears that the reasoning is that when a defendant is a "business," it is more likely to have regular employees, as opposed to conducting individual transactions with contractors. *Cf. Reid*, 490 U.S. at 752; *Natkin*, 111 F. Supp. 2d at 1008–09.

context be able to claim that [the plaintiff] was an independent contractor and . . . later deny him that status to avoid a copyright infringement suit.").

This case is similar.  TDS issued 1099 forms to Myers for 2013, 2014, and 2015, listing her earnings as "non-employee compensation."  TDS did not withhold taxes, nor did it give Myers any benefits.  Although TDS controlled the type of dance (such as jazz, tap, or lyrical), set the time and location of the dance class, and retained the final decision-making authority about whether TDS students would perform the dances at the recital, there is no evidence that TDS or Harold exercised any creative or technical control over the choreography.  Thus, all of the factors that the *Natkin* court considered most important weigh in favor of Myers.

Defendants point out that, unlike the plaintiffs in *Natkin*, who never received W-2s, Myers received a W-2 in 2012 and her "job duties at TDS remained constant" in the following years. (Defs.' Joint Mem. Opposing Pl.'s Mot. for Summ. J. ("Defs.' Resp.") [59] 5.)  But this militates in favor of Myers, as it reflects TDS's conscious choice to change the compensation model and reap the benefits of the independent contractor tax treatment.  Defendants assert that it was Myers herself who requested issuance of a 1099 (DSOAF ¶ 7); if true, this does not change the fact that TDS agreed to the request.  As the *Natkin* court pointed out, employers cannot abandon their choice of the tax treatment of workers after the fact.

Defendants also argue that there is a dispute over how much control each party exercised.  As *Natkin* demonstrates, however, the appropriate focus is on the control of the *creative* aspect of the dance—the copyrighted material itself—into which TDS had essentially no input.  The dance routines were refined when students tried them out during class, as Defendants emphasize; but it was Myers, not Harold or anyone else, who made the refinements.  That TDS provided the facilities and students for Myers's choreography also does not change the outcome; in *Natkin*, the fact that the defendants controlled the studio and the photographed subjects was comparatively unimportant.

Defendants highlight other factors, also present in *Natkin*: that TDS is "in business" and that it had a lengthy relationship with Myers. Neither of these circumstances tipped the balance in *Natkin*, and they do not tip the balance here, either. Although Myers was paid hourly (a pay structure common to employees rather than contractors), there is evidence that the bulk of the choreography work was performed during hours for which she was not paid at all. The fact that Harold, not Myers, would sometimes find substitute instructors also does not overcome the substantial factors that weigh in Myers's favor. The only notable differences between *Natkin* and this case are that Defendants claim that TDS assigned Myers additional projects, such as teaching additional dance routines for charity events, and that the plaintiffs in *Natkin*, unlike Myers, had their own companies which billed the defendants. Neither of these facts can overcome Myers's substantial creative control over her choreography.

Finally, Defendants argue that Myers's choreographing and teaching dance was part of TDS's regular business. While teaching dance is integral to the business of a dance school, the record does not satisfy the court that this is equally true of choreography—Myers could have taught dances choreographed by others. TDS could obtain the rights to various dances via a license. Further, the court in *Natkin* found that "[e]ven assuming this factor weighs in favor of the defendants' position," it did not outweigh the pay, tax, and benefits treatment of the plaintiffs, and the fact that the plaintiffs used their own creative judgment and expertise in creating the photographs. *Natkin*, 111 F. Supp. 2d at 1010. There is no genuine dispute that Myers was an independent contractor.

### 2. Work Specially Ordered or Commissioned

Even if Myers is an independent contractor, Defendant argues, the choreography is a work made for hire if it was specifically commissioned pursuant to a written agreement. That test is met here, Defendants assert, in the FCDC Contract. Again, the court disagrees. To be a work made for hire, the parties must "expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. The only parties who

signed the FCDC Contract were the students and parents, and it was apparently intended to communicate requirements on the part of the dancers. Neither Myers nor Harold actually signed it, as required by the copyright statute. *See Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412 (7th Cir. 1992) ("The statutory language is 'signed by them,' that is, by both parties, and it means what it says.") (internal citation omitted).

More importantly, the FCDC Contract says nothing about commissioning works and makes no express reference to choreography. The statute requires that the parties "expressly" agree that the work is made for hire. What matters for the purpose of the requirement is the language of the document. *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1142 (9th Cir. 2003). The document does not say that Myers will create choreography, and her testimony that she taught dance routines to students does not convert a commitment by those students into a commission agreement between TDS and Myers.

Defendants characterize the FCDC Contract as committing Plaintiff "to creating and teaching dances to students[,]" (Defs.' Mem. 6), but it simply does not say that. At most, Plaintiff commits "to teach and to guide" the students, but that does not necessarily include choreography, nor does it include any commitment to TDS itself. Defendants claim that the fact that the students themselves took on various obligations in the FCDC Contract and paid fees for the classes at which they learned the choreography (DSOF ¶¶ 46–47, 57, 60, 70), creates a dispute over whether the dances were works made for hire, but any obligations the agreement may have imposed on students says nothing about any "express" agreement between TDS and Myers. Moreover, even if the FCDC Contract assumed that Myers would choreograph dances, it would not constitute an agreement that the choreography was a work made for hire or that Defendants would own the copyright. Summary judgment is granted for Myers on the work-made-for-hire issue.

## B.    License

Next, Defendants argue that they had a license to use the choreographed works; they claim they had an express license through the FCDC Contract, or, in the alternative, an implied license.  Plaintiff responds that license is an affirmative defense, which Defendants forfeited because they did not raise it in their answer.  *See* FED. R. CIV. P. 8(c).  Generally, "[t]he failure to plead an affirmative defense in the answer works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it."  *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 436 (7th Cir. 2014) (alteration in original) (internal citation and quotation marks omitted).  Plaintiff responded to Defendants' license arguments in their response to Defendants' summary judgment motion, and their reply in favor of their own motion.  Because Plaintiff was able to respond, the court will address this defense.  *Id.* at 437 (no prejudice when opposing party had opportunity to respond in summary judgment brief).

### 1.    Express License

Defendants claim that the FCDC is an express, exclusive license.  An express, exclusive license is a transfer of copyright ownership, which must be "an instrument of conveyance, or a note or memorandum of the transfer . . . in writing and signed by the owner of the rights conveyed[.]"  17 U.S.C. § 101, 204(a); *see I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996).  An express license agreement need not contain the word "copyright," *see ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 931 (7th Cir. 2003), but it must express intent to transfer copyright.  *S.A.M. Elecs., Inc. v. Osaraprasop*, 39 F. Supp. 2d 1074, 1080 (N.D. Ill. 1999) (citing *Schiller & Schmidt*, 969 F.2d at 413); *see Marya v. Warner/Chappell Music, Inc.*, 131 F. Supp. 3d 975, 1000 (C.D. Cal. 2015) (no license when "Defendants cannot point to any particular evidence that would show us the intent of contracting parties[.]"); *Woods v. Resnick*, 725 F. Supp. 2d 809, 826 (W.D. Wis. 2010) ("[A] particular writing must reflect a clear and equivocal intention on the part of the copyright owner to transfer ownership.") (internal citation and quotation marks omitted); *Foraste v. Brown Univ.*, 290 F. Supp. 2d 234, 240 (D.R.I. 2003)

(collecting cases). This argument meets the same fate as Defendants' work-for-hire argument. Regardless of Myers's testimony, an express license requires a signed contract, and she did not sign the FCDC Contract.

Nor is the FCDC Contract a "memorandum of the transfer." As explained above, the document itself says nothing about choreography. The intent to transfer is not evident from the face of the document. *See Woods*, 725 F. Supp. 2d at 826 (no transfer when the written agreement referred to copyrights, but was not explicitly a transfer of rights); *Foraste*, 290 F. Supp. 2d at 240 (no transfer when the document "fails to make any reference at all to the subject matter of the rights to be transferred, the recipient of the transferred rights, the timing of the transfer, or any other particulars of the deal."); *Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933, 936 (N.D. Cal. 1992) (no transfer when the agreement "makes no reference to publishing rights or rights to musical compositions.").

As with the work-made-for-hire argument, the fact that the students themselves undertook obligations in the FCDC Contract makes no difference. There is reason to doubt that this document—a memorialization of the dance studio's expectations of the students—was a valid contract at all (if students missed rehearsal, would TDS have sued them for breach?). But assuming the FCDC Contract is an agreement, it is one between the students and their parents on one side, and TDS and Myers on the other; it cannot be characterized as an agreement between Myers and TDS. There is no genuine dispute about whether Myers granted an express license, and summary judgment is granted to Myers on that issue.

### 2. Implied License

Next, Defendants argue that Myers gave Defendants a non-exclusive implied license to perform the choreographed works at the recital and the summer performances. Plaintiff responds that even if there was an implied license, it was revocable, and Myers revoked it when she texted Harold and told her not to use the choreography.

Defendants cite to *I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996). In *I.A.E.*, an architect contracted to provide schematic drawings for a construction company for $10,000. *Id.* at 770. The architect anticipated that he would be the architect for the rest of the project, as well. *Id.* at 771. After he delivered the drawings, however, the architect learned that he would no longer be involved in the project, and he wrote the company that "[w]e trust that our ideas and knowledge exhibited in our work will assist [the company] in realizing a credible and flexible use . . . facility." *Id.* (internal citation and quotation marks omitted). The company agreed to pay the architect's contracted price for the drawings, but when the architect later asserted rights in them, the company successfully sued for a declaratory judgment that they were not infringing the architect's copyright. *Id.*

The Seventh Circuit affirmed. It agreed with the district court that, because the architect knew that the drawings would be used for the project, and received $10,000 for preparing them, he granted an implied license. *Id.* at 776–77. Further, the architect "delivered his copyrighted designs without any warning that their further use would constitute copyright infringement." The court viewed the architect's letter as effectively acknowledging that the company would continue to use the drawings even though he would not continue on the project. *Id* at 777. The Seventh Circuit also approvingly cited the Fourth Circuit's dictum that "an implied license is . . . revocable absent consideration[.]" *Id.* at 775 n.10 (citing *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 574 n.12 (4th Cir.1994)).

This case is similar to *I.A.E*, Defendants argue. They point out that Myers testified that she knew that students would perform dances that she taught at the recital, and one can infer that she expected that the FCDC dance team would perform the dances at competitions as well. Also as in *I.A.E.*, Myers choreographed the dances without warning Harold or TDS until after she left that unauthorized use would infringe a copyright. But unlike *I.A.E.*, immediately after resigning her position, Myers told Harold not to use the dances. The fact that TDS cancelled the FCDC dance competitions is significant if it reflects TDS's understanding that any implied

license did not extend beyond the recital.  Yet there is a genuine dispute about whether that is the case, and if Myers did grant a license to TDS for the competitions themselves, it is possible that the license extended to the summer talent shows, given that the same students were performing the dances at roughly the same time that the competitions would have occurred. The fact that Myers was at least aware that TDS planned to use dances she had choreographed, but did not seek additional compensation for them before she resigned, could support an implied license.

Whatever her intentions before she resigned, Myers argues that she revoked any implied license when she sent her text messages.  Whether this was an effective revocation, however, is also disputed.  Law governing this issue is uncertain.  Myers points out that in Illinois, copyright licenses of indefinite duration can be terminated by either party at any time. *See Walthal v. Rusk*, 172 F.3d 481, 485 (7th Cir. 1999).  Defendants point to *Avtec Systems, Inc. v. Peiffer*, 21 F.3d 568, 574 n.12 (4th Cir.1994), cited in *I.A.E.*, which stated in dicta that an implied license is revocable if there is no consideration.  From this dictum, Defendants conclude that the converse is true: that an implied license is irrevocable if there is consideration.  That test, if it applies, does not support summary judgment for Defendants, however.  It is not clear whether Myers received consideration for her choreography.  In *I.A.E.*, the parties' contract specified that the $10,000 was for creation of the drawings, but the record here does not establish that the payments to Myers were for choreography in addition to her teaching services.

The Illinois-based rule that Myers argues for also leaves questions unanswered.  It is not clear whether any implied license in this case really was of unspecified duration.  In *Walthal*, the parties had a written contract that had no term, and did not identify circumstances under which the contract would end.  172 F.3d at 482.  Here, however, the facts could support a finding that Defendants had an implied license to use Myers's choreography for a single dance season: a new dance season began every school year, after which participants were required to sign up for classes again and pay new fees, and a new FCDC dance team was selected.  Myers

testified that she expected that students would perform her dances at the recital, meaning that whether the contract was of unspecified duration is disputed. Under either side's proposed rule, there is a dispute about whether the license was revocable.

In sum, there are genuine disputes about whether Myers granted TDS an implied license, the scope of any such license, and whether that license was revoked. Summary judgment is therefore denied on the issue of an implied license.

## II. Contributory Copyright Infringement

Defendants also move for summary judgment on Count II, contributory copyright infringement. "Liability for contributory infringement will be imposed when a defendant, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distributors*, 983 F. Supp. 1167, 1178 (N.D. Ill. 1997); *see Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). Plaintiff alleges that Defendants contributorily infringed by assisting TDS students in performing at the summer talent shows. Defendants do not dispute that TDS students performed Myers's choreography at the three summer talent shows. Instead, Defendants argue that Plaintiff is unable to prove either knowledge or material inducement. The court finds that there is a genuine dispute of material fact whether Defendants had knowledge of the students' infringing activity, so it need not reach the material inducement issue.

In support of their claim that they lacked knowledge, Defendants rely on *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995),[21] but that case, if anything, supports Plaintiff's position on this issue. There, the

---

[21]    Defendants' other citations are unhelpful. They assert that *Marobie-FL,* 983 F. Supp. at 1178, "adopted" the approach of *Religious Technology Center. Marobie-FL* is a case from this district, not the Seventh Circuit, as Defendants suggest, and it discusses *Religious Technology Center* in the context of direct infringement and vicarious liability, not contributory infringement. *Id.* at 1176–79. Defendants also cite *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001), *as amended* (Apr. 3, 2001), *aff'd sub nom. A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002), *and aff'd sub nom. A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002), but give no explanation for how this case supports their argument. Defendants' assertion that *A&M Records* was "adopted" by *Metro-Goldwyn-Mayer*

plaintiff notified the defendant, an Internet service provider, that an individual was posting allegedly infringing material—writings by L. Ron Hubbard—on the Internet through its system. *Id.* at 1373. The court denied summary judgment for the defendant, explaining that the defendant's knowledge was sufficiently disputed, because "[a]lthough a mere unsupported allegation of infringement by a copyright owner may not automatically put a defendant on notice of infringing activity, [the defendant's] position that liability must be unequivocal is unsupportable." *Id.* at 1374. The court found that because the works contained copyright notices, "it is difficult to argue that a defendant did not know that the works were copyrighted[,]" but denied summary judgment because there was "at least a colorable claim of fair use." *Id.*

Defendants believe that they had even less notice than the defendants in *Religious Technology Center*, because Myers had not yet applied for copyright registration at the time of the performances. But Defendants arguably had even more notice than the defendants in *Religious Technology Center*, because Defendants knew that Myers had choreographed at least some of the dances at issue. Defendants again invoke the FCDC Contract in support of their claim of fair use, but that document does not support a defense for the reasons set forth above. Indeed, all of Defendants' "lack of knowledge" argument is directed at knowledge of Myers's claimed copyright; Defendants do not claim that they did not know of the infringing activity—that TDS students performed at the summer talent shows—and Defendants had knowledge of at least some of these performances. Summary judgment is denied on Count II.

## III. Unjust Enrichment

Defendants have two arguments for summary judgment on Count III. First, Defendants point out that Myers may not recover for unjust enrichment when "an actual contract governs the parties' relation on that issue." *Keck Garrett & Assocs., Inc. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) (citing *Illinois ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill. 2d 473,

---

*Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 924 (2005) is also incorrect. *Grokster* merely referred to the underlying suit in *A&M Records* in its account of the development of the technology at issue in that case.

497, 607 N.E.2d 165, 177 (1992)). But the most that Myers "promises" under the document is to "teach and guide" students, which is a commitment to the students, not to Harold or TDS.

Second, Defendant argues that "Plaintiff has no copyright claim to the choreographic works to begin with, and therefore cannot claim she has been unjustly enriched." (Defs.' Mem. 19.) As explained above, there is at least a genuine dispute as to Plaintiff's copyright claims. Summary judgment is denied with respect to Plaintiff's unjust enrichment claim.

## IV.    Affirmative Defenses

Plaintiffs also move for summary judgment on all of Defendants' affirmative defenses. Plaintiff served Defendants with interrogatories, asking Defendants to identify the evidence supporting the affirmative defenses; Plaintiff now contends that the evidence supporting those affirmative defenses is insufficient to survive summary judgment. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") [37] 15–16.) Defendants argue that all they must do is satisfy Rule 8(c) and characterize Plaintiff's argument as a "discovery dispute." (Defs.' Resp. 16–17.) This misstates the standard; at summary judgment, Defendants must provide evidence supporting these affirmative defenses. *See Wilson v. Sundstrand Corp.*, No. 99 C 6944, 2003 WL 21961359, at *4 (N.D. Ill. Aug. 18, 2003) ("A party may properly seek summary judgment [on an affirmative defense] by essentially throwing the ball into the court of the party with the burden of proof."). "[T]he basic concept of an affirmative defense is an admission of the facts alleged in the complaint, coupled with the assertion of some other reason defendant is not liable." *Instituto Nacional De Comercializacion Agricola (Indeca) v. Cont'l Illinois Nat. Bank & Trust Co.*, 576 F. Supp. 985, 988 (N.D. Ill. 1983); *see also Bell*, 827 F.3d at 704.

### A.    Affirmative Defense 1

Defendant's first affirmative defense is that the complaint "fails to state facts sufficient to constitute a cause of action." (Joint Am. Answer.) Assuming this can be raised as an affirmative defense at all, *see Mandel Metals, Inc. v. Walker Grp. Holdings*, No. 14 CV 8493, 2015 WL 3962005, at *10 (N.D. Ill. June 26, 2015), here it simply reiterates Defendants'

arguments that Plaintiff does not meet the elements of the claims. These arguments are more properly addressed as part of Plaintiff's case in chief, and the court strikes the first affirmative defense as redundant pursuant to FED. R. CIV. P. 12(f).

**B.      Affirmative Defense 2**

As a second affirmative defense. Defendants allege that Myers has unclean hands. Unclean hands is an equitable defense that precludes a judgment that would "encourage or reward criminal or other unlawful activity." *Schlueter v. Latek*, 683 F.3d 350, 355 (7th Cir. 2012). As allegedly improper behavior by Myers, Defendants list tortious interference, extortion, and the filing of a frivolous lawsuit. (Defs.' Resp. 19; *see* Pl.'s Mem. 17.) Defendants do not explain how Myers has interfered with Defendants' business, however, nor do they even state the elements of extortion. Defendants' suggestion that Myers's suit is frivolous obviously fails, as some of her claims are not only colorable, but merit summary judgment.

Defendants warn that "an award for Plaintiff would mean that every single dance studio teacher across the country who wishes s/he were being paid more could simply quit working shortly before their students' dance recital, and use the threat of costly copyright litigation and six-figure statutory damages to increase their paychecks or bolster their own clientele[.]" (Defs.' Resp. 19.) The court does not share the assumption that all dance teachers are also choreographers. Nor does Plaintiff's pursuit of statutory rights constitute unclean hands. As Plaintiff notes, Defendants could have avoided this situation by documenting who would own the copyright over Myers's choreography. Summary judgment is granted on the second affirmative defense.

**C.      Affirmative Defense 3**

Defendants' third affirmative defense is waiver. The waiver doctrine acknowledges that a right may be "taken away from its holder as a penalty for failure to assert it in a clear and timely manner." *Goldman v. Gagnard*, 757 F.3d 575, 579 (7th Cir. 2014) (internal citation and quotation marks omitted). But Defendants have not explained how Myers has failed to assert

her rights, nor do they address the legal requirements for a waiver defense. Instead, Defendants highlight irrelevant issues already dispatched by the court: they claim that her claim is frivolous, that it is tortious interference, and that she has been compensated for her choreography. Defendants' waiver defense is stricken.

### D. Affirmative Defense 4

Defendants' fourth affirmative defense invokes the after-acquired evidence doctrine. This is a rule of damages in employment discrimination cases, *see Cuff v. Trans States Holdings, Inc.*, 816 F. Supp. 2d 556, 568 (N.D. Ill. 2011), and has no relevance here. Defendants do not identify any evidence of wrongdoing by Myers that they acquired after the lawsuit was initiated. Indeed, Defendants do not respond to Plaintiff's arguments that this defense should be dismissed, and have therefore forfeited it. Summary judgment is granted on that affirmative defense.

### E. Affirmative Defenses 5 and 6

Defendant's fifth affirmative defense claims unjust enrichment on the theory that "Plaintiff has already been compensated for the use of the choreography[.]" (Defs.' Resp. 18.) This essentially repeats Defendants' arguments that Myers has been compensated for creating the dances, either as works-for-hire or under a license. Any other argument about Plaintiff's compensation is more appropriately a question of damages, not a bar to recovery. Similarly, Affirmative Defense 6 argues that the dances are works-for-hire, a matter the court has addressed extensively. The court has granted summary judgment in favor of Plaintiff on these defenses.

### F. Affirmative Defense 7

As a seventh affirmative defense, Defendants invoked the doctrines of "fair use," "first sale," and "joint works of authorship." In an interrogatory answer, Defendants expanded this defense, suggesting that the choreographed works had educational purposes; that the use they made of the Myers's work was "transformative;" that Defendants had a license to use the works;

and that Defendants contributed to or commissioned the works. Defendants have offered no evidence concerning the "educational" or "fair" use of the dances, nor any evidence concerning "first sale," so the court need not address those defenses.

That leaves the contention that Defendants' use of the dances was "transformative" and that Defendants enjoyed joint ownership of the copyrights. Myers has shown that, with limited exceptions identified below, there is no genuine dispute on these issues. The only support for the claim that their use was "transformative" is that the props and costumes that appear in the videos that Myers submitted to the Copyright Office were different from those used in the recital. This is not transformative use. "[A] work is not considered transformative if it serves the same purpose as plaintiff's original or derivative works." *Ty, Inc. v. Publications Int'l, Ltd.*, 333 F. Supp. 2d 705, 712 (N.D. Ill. 2004). In *Ty*, the allegedly infringing work was a collection of photographs of Beanie Babies. *Id.* The court held that the toys, considered "soft sculptures," and the photographs "serve[d] an aesthetic, decorative purpose—to be viewed and enjoyed as works of visual art." *Id.* Because they had the same purpose, the photograph book was not transformative use. *Id.* In this case, that the videos that Myers submitted to the Copyright Office show specific performances of the dances does not mean that her copyright covers only those performances. Changing costumes does not transform the choreography itself.

Defendants' claim of joint authorship of the choreography fares no better, at least with respect to *Baby I'm a Star*, *Desperate Housewives*, and *Guts & Glory*. It is undisputed that Myers choreographed those dances. There is some evidence of joint authorship for *Music Box Dancer*: A parent of a student who performed *Music Box Dancer* claims that the dance was not completed when Myers left TDS, and Myers and Ryan Brandt are jointly listed as choreographers in the recital program. Further, because there is no evidence about the authorship of *Turn Down for What*, Plaintiff has not shown that there is no dispute concerning joint authorship for that dance, either. Summary judgment is granted to Plaintiff on the "transformative" use defense and on the "joint authorship" defense with respect to *Baby I'm a*

*Star*, *Desperate Housewives*, and *Guts & Glory*. It was Brandt, not TDS, who contributed to the choreography for *Music Box Dancer* and perhaps for *Turn Down for What*, but assuming that TDS is entitled to assert a joint authorship defense, summary judgment is denied with respect to those two dances.

## **CONCLUSION**

Defendants' motion for summary judgment [51] is denied. Plaintiff's motion for summary judgment [35] is granted in part and denied in part.

ENTER:

Dated: August 24, 2017

_____
REBECCA R. PALLMEYER
United States District Judge